Abdullah Y. SALAHUDDIN, Plaintiff–Appellant,

v.

Glenn GOORD, Commissioner; Dr. Lester N. Wright, Deputy Commissioner/Chief Medical Officer; Donald R. Selsky, Director, Special Housing Unit/Inmate Disciplinary Program; Teresa Knapp–David, Director Classification and Movement; Thomas Egan, Director Inmate Grievance Committee Program/Central Office Review Committee; All Employees of the New York State Department of Correctional Services ("Docs"); John P. Keane, Superintendent; Elias Carrillo, Deputy Superintendent for Programs; T.J. Miller, Deputy Superintendent for Administration; Thomas Briggs, Senior Counselor/Freedom of Information Officer/ Chairman, Program Committee; Tim Turbush, Supervisor, Inmate Grievance Program; Lawrence Jones, Disciplinary Lieutenant; Constant, Lieutenant/Hearing Officer; Ronald Krom, Captain; E. Noecker, Correction Officer; All Employees of the Woodbourne Correctional Facility ("Woodbourne"); David Miller, Superintendent; John Doe, Doctor; Sanchez, Correction Officer; All Employees of the Eastern Correctional Facility ("Eastern"); John McGinnis, Superintendent; John Doe II, Correction Officer; All Employees of the Downstate Correctional Facility ("Downstate"); Hans Walker, Superintendent; John Doe III, Correction Officer; Jane Doe, Nurse; All Employees of the Auburn Correctional Facility ("Auburn"); Ronald Moscicki, Superintendent; Michael R. Marshall, Deputy Superintendent for Administration; Dr. Piazza; Dr. Weyand; Dr. L. Wyzykowski; J. Steeg, Nurse Administrator I; Jane Doe II, Supervisor, Inmate Grievance Program; Murphy, Lieutenant; J. Phillips, Correction Officer; All Employees of the Lakeview Correctional Facility ("Lakeview"); Victor Herbert, Superintendent; Cochran, Sergeant; Stanton, Correction Officer; Fraye, Correction Officer; All Employees of the Attica Correctional Facility ("Attica"); all in their official and individual capacities; and New York State Department of Correction-

al Services, Defendants–Appellees.*

**Docket No. 04–3470–PR.**

United States Court of Appeals,
Second Circuit.

Argued: April 25, 2006.

Decided: Oct. 27, 2006.

* This caption varies from the official caption, which is incorrect in certain respects. See

Compl. 1. The Clerk of the Court is directed to amend the official caption accordingly.

Austin Berry, Rukhsanah Lighari, Jeffrey A. Shooman ** (Jon Romberg, on the brief), Seton Hall University School of Law, Center for Social Justice, Newark, NJ, for Plaintiff–Appellant.

David Lawrence III, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, Michelle Aronowitz, Deputy Solicitor General, on the brief), New York, NY, for Defendants–Appellees.

Before KEARSE, WALKER and WALLACE,*** Circuit Judges.

** Law students appearing pursuant to Local Rule 46(e).

JOHN M. WALKER, JR., Circuit Judge.

In this 42 U.S.C. § 1983 action, a prisoner brings two sets of claims relevant on appeal: (1) claims for violation of his First Amendment right to free exercise of religion and his free-exercise right under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc; and (2) a claim for violation of his Eighth Amendment right to be free of cruel and unusual punishment. The prisoner alleges that prison officials forced Shi'ite and Sunni Muslims to conduct Ramadan services jointly, denied him Islamic holiday meals and the ability to attend Islamic worship services, and refused to provide him with a Muslim chaplain or a free Qur'an. The prisoner's Eighth Amendment claim stems from alleged deliberate indifference to his serious medical need for immediate Hepatitis C treatment. The District Court for the Southern District of New York (Charles L. Brieant, *Judge*) granted summary judgment to the defendants on all of the prisoner's claims. We affirm in part, vacate in part, and remand.

## BACKGROUND

Plaintiff-appellant Abdullah Y. Salahuddin was and remains in the custody of the New York State Department of Correctional Services ("DOCS"). His claims on appeal pertain to aspects of his incarceration at various DOCS facilities.

### I. Religious–Liberty Claims

Salahuddin claims that prison officials violated his constitutional and statutory rights to free exercise of religion in five distinct ways:

*** The Honorable J. Clifford Wallace, United States Court of Appeals for the Ninth Circuit, sitting by designation.

**Joint-worship claim**—Salahuddin claims that while housed in Woodbourne Correctional Facility ("Woodbourne") in 2000, prison officials required that Sunni Muslims, such as Salahuddin, pray and fast for Ramadan jointly with Shi'ite Muslims.

**Keeplock claim**—Salahuddin was placed in disciplinary keeplock for conspiracy to assault a prisoner in Woodbourne. Salahuddin claims that while in disciplinary keeplock at Auburn Correctional Facility ("Auburn") and Attica Correctional Facility ("Attica"), he was denied the ability to attend Islamic holiday services or, alternatively, to eat holiday meals in his cell.

**Qur'an/chaplain claim**—Salahuddin claims that although Lakeview Correctional Facility ("Lakeview") would provide him with a Catholic chaplain and a free Bible, it would not provide a Muslim chaplain and, having no Qur'an in the prison library, required him to buy his own copy.

**Legal-mail claim**—Salahuddin claims that while housed in Attica, defendant-appellee Frey refused to admit Salahuddin into a religious service while carrying legal mail and would not allow Salahuddin temporarily to store the mail at Frey's station outside the service hall, as had been allowed previously.

**Law-library claim**—Salahuddin claims that while housed in Attica in 2001, defendant-appellee Stanton forced him to choose between using the law library or attending Ramadan services on any given day. Stanton allegedly denied Salahuddin Ramadan meals on days that Salahuddin used the law library.

At the close of discovery, Magistrate Judge Fox recommended granting summary judgment to the defendants on the joint-worship claim and denying summary judgment on the keeplock, law-library, and legal-mail claims. The magistrate judge's report did not address the Qur'an/chaplain claim. After initially adopting the magistrate judge's recommendations in their entirety, the district court, on reconsideration, granted summary judgment to the defendants on all of Salahuddin's claims. Without citation to any authority, the district court concluded that there had been no violation of Salahuddin's free-exercise rights and, alternatively, that qualified immunity protected the defendants.

## II. Eighth Amendment Claim

Salahuddin separately claims that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by delaying treatment for his Hepatitis C infection. The infection was first diagnosed in September or October 2000, while Salahuddin was in custody at Woodbourne. At year's end, a doctor at Woodbourne informed Salahuddin that for the medical staff to determine the correct course of treatment, Salahuddin would have to undergo a liver biopsy.

That biopsy was delayed for several months due to a series of events. First, Salahuddin was administratively tried and placed in disciplinary keeplock in December 2000 for conspiracy to assault an inmate. Next, in late December 2000 and January 2001, Salahuddin was transferred from Woodbourne to Eastern Correctional Facility to Downstate Correctional Facility to Auburn and, finally, to Lakeview, with the liver biopsy delayed during transit.

Then, sometime in February or March 2001, defendant-appellee Dr. Piazza, a physician on Lakeview's medical staff, canceled Salahuddin's liver biopsy because Salahuddin was eligible for parole within the next twelve months. Piazza believed this decision to be mandated by the DOCS Hepatitis C Primary Care Practice Guideline, a DOCS-wide policy promulgated by defendant-appellee Dr. Wright, the DOCS Chief Medical Officer. The record does not contain the text of that policy, but Wright quoted the policy as stating that Hepatitis C treatment will not proceed unless an inmate has "anticipated incarceration of at least 12 months." Wright Aff. ¶ 7. Wright explained that this twelve-month policy was justified because it is medically important for prisoners to receive a complete course of Hepatitis C treatment. Wright testified that "there is no program available to pay for the treatment and monitoring of completion of care of the patient after release." Id. ¶ 14. Wright further stated that it was justifiable to assure a complete course of treatment by postponing treatment until after a parole decision because "Hepatitis C tends to have a relatively slow progression ... usually occur[ing] over a period of two to three decades" and "is NOT invariably fatal." Id. ¶¶ 8, 9.

Wright stated that he told prison medical staff that he, himself, would determine an inmate's likely length of incarceration "based on [his] best prediction of what [the] Parole Board will determine." Id. ¶ 14. Aware of the written policy but evidently unaware of Wright's instructions, Piazza interpreted the policy as forbidding treatment of inmates within one year of their parole-eligibility date, not their expected release date as determined by Wright. Thus, in early 2001, Piazza canceled Salahuddin's liver biopsy without further inquiry.

On the day before Salahuddin's July 2001 parole hearing, Wright intervened and placed Salahuddin's treatment back on track by approving Salahuddin for a liver biopsy. The next day, Salahuddin went before the parole board and was denied parole. Salahuddin received the liver biopsy sometime during or before December 2001—neither party has seen fit to inform us of the precise date. After Salahuddin spent several months on a national waiting list for a new medication, an unidentified physician at Attica, where Salahuddin was then incarcerated, canceled an eventual shipment of medication because Salahuddin then had less than twelve months remaining until his next parole-board hearing. In December 2002, Wright intervened again and ordered expedited delivery of the medicine, which Salahuddin began receiving in January 2003. During the more than two years between his diagnosis and his eventual receipt of medication, Salahuddin complained to various prison officials and medical personnel about stomach pain, digestive problems, fever, chronic diarrhea, fatigue, and other maladies.

After the close of discovery, Magistrate Judge Fox filed a report recommending that the district court deny the defendants' motion for summary judgment on this claim. The district court initially followed this recommendation, but, on reconsideration, granted summary judgment to the defendants, holding that (1) no evidence shows a causal link between the delay in treating the Hepatitis C infection and Salahuddin's complaints of pain and (2) the evidence shows that prison officials did not act with deliberate indifference, and at most mistakenly applied the DOCS twelve-month policy.

## ANALYSIS

### I. Mootness

As a preliminary matter, we must decide whether mootness deprives us of jurisdiction over any or all of Salahuddin's claims on appeal. In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility. See Prins v. Coughlin, 76 F.3d 504, 506 (2d Cir.1996) (per curiam); Young v. Coughlin, 866 F.2d 567, 568 n. 1 (2d Cir.1989); Mawhinney v. Henderson, 542 F.2d 1, 2 (2d Cir.1976). Salahuddin is presently incarcerated in Oneida Correctional Facility, which is not one of the prison facilities in which the actions complained of here occurred, and therefore we hold moot all injunctive and declaratory claims against defendants other than Goord, Wright, Selsky, Knapp–David, Eagan, and "employees of New York State Department of Correctional Services."

At oral argument, Salahuddin abandoned some, but not all, of his claims for equitable relief. In response to our questions about mootness, Salahuddin's attorneys responded that Salahuddin no longer seeks injunctive relief as to his religious-liberty claims (which was not requested in the complaint, Salahuddin Compl. ¶¶ A–I) or declaratory relief as to his Eighth Amendment claim. Oral Arg. Recording at 10:46:30, 10:48:40. Because we remand this case only as to certain religious-liberty claims, Salahuddin's equitable relief, if any, will be limited to declaratory judgment. Of course, Salahuddin's right to seek damages is not affected.

### II. Standard of Review

This court reviews de novo the district court's summary judgment, using the same standard as the district court: "summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998); see also GlobalNet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 381 (2d Cir.2006). In deciding whether there is a genuine issue of material fact, we must interpret all ambiguities and draw all factual inferences in favor of the nonmoving party. Ford v. McGinnis, 352 F.3d 582, 587 (2d Cir.2003). We may consider only the evidence before the district court, see DiBella v. Hopkins, 403 F.3d 102, 118 (2d Cir.2005), and summary judgment cannot be entered on the basis of factual statements only in the parties' briefs, see Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, 10A Federal Practice and Procedure § 2723, at 389 (3d ed.1998).

The moving party bears the initial burden of showing why it is entitled to summary judgment. See Celotex, 477 U.S. at 323, 106 S.Ct. 2548. Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to

evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Farid v. Smith,* 850 F.2d 917, 924 (2d Cir.1988); Wright et al., *supra,* § 2727, at 471–75. If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact. Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348.

### III. Qualified Immunity

 As an affirmative defense to monetary liability on both the religious-liberty and Eighth Amendment claims, the defendants seek the protection of qualified immunity. The doctrine of qualified immunity shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Ruling on the qualified-immunity defense requires a two-step inquiry. First, we must consider whether the plaintiff's factual allegations, both those unchallenged and those as to which the record creates a genuine dispute, "show the [official's] conduct violated a constitutional [or statutory] right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). This first inquiry is the same as the one that we undertake in assessing a summary-judgment motion.

 If the assumed facts do not establish a violation, the defendant must be granted summary judgment. *Id.* On the other hand, if violation of a right can be shown, "the next, sequential step is to ask whether the right was clearly established," *id.,* and, if it was, whether "the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendant[ ] to believe that [he][was] acting in a fashion that did not violate a clearly established right," *In re State Police Litig.,* 88 F.3d 111, 123 (2d Cir.1996).

### IV. Salahuddin's Religious–Liberty Claims

Salahuddin's religious-liberty claims derive from two independent sources: § 3 of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc–1, and the Free Exercise Clause of the First Amendment. RLUIPA protects inmates by providing that a government shall not "impose a substantial burden" on the "religious exercise"[1] of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means. 42 U.S.C. § 2000cc–1(a). RLUIPA creates a private right of action for violations of § 3, *id.*

---

1. RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

§ 2000cc–2(a), and the defendants do not dispute the validity or applicability of § 3 in this case.[2]

The analysis of Salahuddin's free-exercise claims proceeds under a slightly different framework, set forth by the Supreme Court in *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). In *O'Lone*, the Court acknowledged that, although prisoners do not abandon their constitutional rights at the prison door, " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system,' " *id.* at 348, 107 S.Ct. 2400 (quoting *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948)); *see also Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (making the same point). Accordingly, the Court held that a challenged prison regulation is judged "under a 'reasonableness' test less restrictive than that ordinarily applied": a regulation that burdens a protected right passes constitutional muster " 'if it is reasonably related to legitimate penological interests.' " *O'Lone*, 482 U.S. at 349, 107 S.Ct. 2400 (quoting *Turner*, 482 U.S. at 89, 107 S.Ct. 2254).[3]

Courts must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action [4] has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests. *Turner*, 482 U.S. at 90–91, 107 S.Ct. 2254. The first *Turner* "factor" is more properly labeled an "element" because it is not simply a consideration to be weighed but rather an essential requirement. *See O'Lone*, 482 U.S. at 350, 107 S.Ct. 2400 ("[A] regulation must have a logical connection to legitimate governmental interests...."); *Turner*, 482 U.S. at 89, 107 S.Ct. 2254 ("[T]here must be a valid rational connection ...." (quotation marks omitted)); *see also Sutton v. Rasheed*, 323 F.3d 236, 253 (3d Cir.2003) (per curiam) ("The first [*Turner*] factor is foremost in the sense that a rational connection is a threshold requirement ...." (quotation marks omitted)).

The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held reli-

**2.** Section 3 applies if "the substantial burden [on religious exercise] is imposed in a program or activity that receives Federal financial assistance." 42 U.S.C. § 2000cc–1(b)(1). In the prison context, this section sweeps broadly, as "[e]very State ... accepts federal funding for its prisons." *Cutter v. Wilkinson*, 544 U.S. 709, 716 n. 4, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).

**3.** We do not decide today what effect the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), has on the *O'Lone* standards for judging prisoner free-exercise claims because neither party argues that *Smith* changes the analysis. *See Ford*, 352

F.3d at 594 n. 13 (applying the *O'Lone* framework where the government did not argue that *Smith* altered the *O'Lone* standards); *Levitan v. Ashcroft*, 281 F.3d 1313, 1318–19 (D.C.Cir.2002) (exploring the possible implications of *Smith*, but using the *O'Lone* substantial-burden/reasonableness framework where the government did not dispute its propriety).

**4.** An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise. *See Ford*, 352 F.3d at 595 n. 15 (citing *Young*, 866 F.2d 567).

gious beliefs. *Ford,* 352 F.3d at 591.[5] The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; "the burden remains with the prisoner to 'show that these [articulated] concerns were irrational.'" *Id.* at 595 (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir.1989)); *see also Jones v. N.C. Prisoners' Labor Union, Inc.,* 433 U.S. 119, 127–28, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (prison officials need only testify to the legitimate penological interests behind the challenged conduct to meet their burden of proof). We now turn to Salahuddin's specific claims.

**A. Joint–Worship Claim**

■■■ The defendants argue that, on the facts established by the record, Salahuddin fails as a matter of law to meet his prima facie burden of demonstrating that a defendant substantially burdened his right to free exercise of religion by not providing separate Sunni and Shi'ite Ramadan services. This may be so, but this argument is not properly before us because defendants did not raise it in the district court. Defs.' Mem. of L. in Supp. of Mot. for Summ. J. 27–28 (arguing, as it pertains to this claim, only that it was reasonable for prison officials to order joint Ramadan services); *see Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 114 (2d Cir.2005) (refusing to consider an argument raised for the first time on appeal). Thus, we decline to consider the defendants' no-substantial-burden argument.

We also understand the defendants to argue that legitimate penological concerns about security, as well as fiscal, space, and staffing limitations, justified the joint Ramadan services of which Salahuddin complains. Again, that may be so, but the defendants have not pointed to anything in the record to show that they relied on legitimate penological justifications. Nor does our review of the record reveal any such evidence. Neither the district court nor this court can manufacture facts out of thin air. Without some support in the record, we cannot find that Woodbourne officials were worried that separate services would endanger inmates, or were short on space for separate services, or had some other reason for mandating the joint services. Rather, it is the defendants' duty on summary judgment to cite record evidence to this effect.

■■■ Although the facts at trial might show otherwise, at this stage, the unchallenged and unresolved factual allegations as viewed in the light most favorable to Salahuddin establish that Salahuddin's free-exercise rights were substantially burdened by a joint-worship policy not justified by a legitimate penological interest or, *a fortiori,* the compelling governmental interest required by RLUIPA. These facts show the violation of both Salahuddin's RLUIPA and First Amendment free-exercise rights. Qualified immunity is not appropriate at this stage because it was clearly established at the time of the alleged violations that prison officials may not substantially burden inmates'

---

**5.** Resolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the "substantial burden" threshold requirement. Nor is it necessary for us to resolve the parties' disagreement about whether the substantial-burden test includes an inquiry into the centrality or importance of a burdened practice to the plaintiff's system of religious belief. Although the defendants argue that the test includes a centrality inquiry, they never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to Salahuddin's religion.

right to religious exercise without some justification and because we cannot say as a matter of law that it was objectively reasonable for any defendant to believe that the facts as they stand on summary judgment showed no violation of a clearly established right. Accordingly, these issues remain to be resolved in further proceedings.

Salahuddin's declaration states that defendants Keane and Carrillo ordered the joint-worship services and that defendants Turbush, Goord, and Eagan were also involved in this violation. Salahuddin Decl. ¶¶ 35, 38, 43–44. Because the defendants did not raise, and the district court did not rule on, whether any of these defendants was sufficiently involved in the alleged constitutional violation to be personally liable under § 1983 or RLUIPA, we leave the issue to the district court to consider in the first instance. Thus, we vacate the judgment as to Keane, Carrillo, Turbush, Goord, and Eagan on this claim.

### B. Keeplock Claim

■ The defendants fail to dispute on appeal several aspects of the keeplock claim. They do not contest Salahuddin's factual allegation that, while housed in disciplinary keeplock in Auburn and Attica, he was denied access to Islamic holiday services and prevented from receiving holiday meals in his cell.[6] Nor do they dispute that these facts may satisfy the threshold requirement of a substantial burden on Salahuddin's religious exercise.

The defendants do argue that denying Salahuddin the ability to observe these religious rites was reasonable in light of their legitimate penological—interest a compelling interest—in protecting inmate safety. After all, the defendants point out, Salahuddin was put in disciplinary keeplock for conspiring to assault another inmate who was also a member of the Muslim community at Woodbourne.

This argument has two flaws. First, it does not account for Salahuddin's undisputed factual allegation, Salahuddin Compl. ¶ 108, that prison officials substantially burdened his right to religious exercise by denying him religious meals in his cell. We fail to see, and the record does not establish, how denying Salahuddin in-cell meals (as opposed to communal meals) could relate to an interest in avoiding inmate violence.

■ Second, the defendants do not point to any record evidence that suggests that the denial of religious exercise while in disciplinary keeplock at Auburn and Attica was actually viewed as preventing threats to inmate safety. Under both *Turner* and *O'Lone*, once a prisoner shows that a prison regulation impinges on a protected right, prison officials must show that the disputed official conduct was motivated by a legitimate penological interest. *See O'Lone*, 482 U.S. at 350, 351, 353, 107 S.Ct. 2400 (reviewing the testimony of prison officials about the administrative concerns that motivated the challenged

---

6. The defendants claim that Salahuddin has waived any claim premised upon the denial of in-cell religious meals because he mentioned it only on page 8 of his brief, in the fact section. An issue that is "not sufficiently argued in the briefs" is "considered waived and normally will not be addressed on appeal," *Warren v. Garvin*, 219 F.3d 111, 113 n. 2 (2d Cir.2000) (declining to consider an issue addressed only at oral argument) (internal quotation marks omitted); *see, e.g., United States*

*v. Restrepo*, 986 F.2d 1462, 1462 (2d Cir.1993) (declining to consider a contention conclusorily asserted only in a footnote). However, this court has ample discretion to excuse such a failure, and we are especially inclined to exercise that discretion where, as here, there can be no question of surprise as to the nature of the contention, and refusing to consider the issue would "result in substantial injustice," *Mehta v. Surles*, 905 F.2d 595, 598 (2d Cir.1990).

regulation and their reasons for rejecting other means of accommodating the burdened religious exercise); *Turner*, 482 U.S. at 87, 91, 93, 97–98, 107 S.Ct. 2254 (repeatedly looking to the record to find reasons for the disputed prison regulations). Post hoc justifications with no record support will not suffice.

The record here supports the defendants' point that Salahuddin was confined to disciplinary keeplock as punishment for conspiring in the assault on inmate Wilson, a member of the Muslim community at Woodbourne. Salahuddin's sworn declaration says as much. Salahuddin Decl. ¶¶ 45, 50, 54, 61. And, of course, prison officials have a duty to prevent threats to other prisoners' safety. But the Supreme Court requires the government to close the circle—prison officials must have been pursuing the interest in inmate safety when limiting Salahuddin's religious exercise. The defendants' burden on summary judgment is to "point[ ] to [something] in the record suggesting that the [denial of religious exercise] *was viewed as* preventing [threats to inmate safety]." *Turner*, 482 U.S. at 98, 107 S.Ct. 2254 (emphasis added). This requirement makes good sense because it ensures that prison officials actually had, not just could have had, a legitimate reason for burdening protected activity. We would not be surprised if such evidence were forthcoming at trial (at least as to the denial of congregate worship), but it is absent from the record as presently developed.

The two Second Circuit cases on prisoner "keeplock claims" confirm our holding. In *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir.1989), we reversed the dismissal of a First Amendment free-exercise claim because the existence of a justifying legitimate penological interest was not revealed by the record. In language applicable here, we explained that "the district court

should not have dismissed appellant's [F]irst [A]mendment claim without requiring prison officials to establish the basis for the [F]irst [A]mendment restrictions imposed." *Id.*

The defendants seek shelter in our decision in *Salahuddin v. Jones*, 992 F.2d 447 (2d Cir.1993) (per curiam), which affirmed the dismissal of a prisoner's free-exercise claim premised upon an exclusion from congregate worship services while in disciplinary keeplock. To be sure, *Salahuddin* dealt with circumstances similar to those in this case, but that opinion, while not explicit on the point, indicates that inmate safety was "the state's purpose" for prohibiting the religious exercise. *Id.* at 449. In the present case, however, Salahuddin was placed in keeplock for conspiring to assault Wilson, an inmate at Woodbourne. There is no indication in the record that Wilson was an inmate at Auburn or Attica when Salahuddin was at those institutions or that prison officials believed that Salahuddin posed a threat to the safety of any other inmate or to inmates in general at Auburn or Attica. Accordingly, defendants here, unlike in *Salahuddin*, have not offered record evidence from which we can conclude that they had a legitimate purpose in burdening the plaintiff's religious exercise by keeping him in keeplock while he was an inmate at Auburn or Attica.

█ In sum, the defendants have not provided sufficient justification to uphold the summary judgment on Salahuddin's keeplock claim. The facts, viewed in the light most favorable to Salahuddin, show a violation of his free-exercise rights by exclusion from religious services and denial of in-cell religious meals for no permissible reason. Nor is summary judgment on the basis of qualified immunity appropriate; the disputed rights were clearly established at the time of the alleged violations and we cannot say, as a matter of law, that

the conduct described by the factual allegations would be reasonably perceived as constitutional.

Salahuddin identifies defendants Cochran, Walker, Herbert, Goord, Wright, and Eagan as responsible for the alleged keeplock violation by virtue of their inaction after Salahuddin's complaints. Salahuddin Decl. ¶¶ 73, 79. Allowing the district court to consider in the first instance the personal involvement of these defendants, we vacate the judgment as to Cochran, Walker, Herbert, Goord, Wright, and Eagan on this claim.

### C. Qur'an/Chaplain Claim

■ The defendants failed to mention the Qur'an/chaplain claim in their motion for summary judgment in district court, Defs.' Mem. of L. in Supp. of Mot. for Summ. J. 24–28, and therefore they never showed prima facie entitlement to summary judgment on it. Thus, we vacate the judgment as to all defendants on this claim. This failure perhaps explains why the magistrate judge did not discuss the claim in his report, much less recommend whether summary judgment should be granted or denied on it, and why the district court (apparently inadvertently) dismissed the claim in its judgment although purporting in its memorandum and order to adopt the magistrate judge's report.

### D. Legal–Mail Claim

■ To draw into dispute Salahuddin's factual allegations on the legal-mail claim, the defendants point to defendant Frey's sworn declaration describing the events underlying the claim. Although Salahuddin claims that Frey refused to admit Salahuddin into a religious service while carrying legal mail and would not allow Salahuddin temporarily to store the mail outside the service hall, Frey's declaration establishes that Salahuddin was of-fered the choice of leaving the letter outside the service hall or going back to his cell to leave behind the letter and returning to join the service. Salahuddin received adequate notice that he needed to submit affidavits or other admissible evidence to create a genuine factual dispute on his claims, see Notice to Pro Se Litigant Opp. Mot. for Summ. J., Docket No. 54; S.D.N.Y. R.C.P. 56.2, but he points only to his unsworn complaint to dispute Frey's version of events. Thus, we accept Frey's account of the facts. *See Matsushita Elec. Corp.*, 475 U.S. at 586, 106 S.Ct. 1348. Faced with the defendants' argument that Salahuddin shows no burden on his religious exercise from Frey's conduct, Salahuddin points to nothing in the record to show a genuine issue to be tried as to the burden element. Thus, summary judgment for the defendants on this claim was proper.

### E. Law–Library Claim

The defendants do not contest that defendant Stanton denied Salahuddin attendance at Ramadan meals and services on days that Salahuddin chose to use the law library. And they do not dispute that the denial substantially burdened Salahuddin's religious exercise. Indeed, the defendants do not even argue that they are entitled to judgment as a matter of law because they have a legitimate penological reason for this denial. Thus, we easily hold that because the defendants do not point to any record evidence establishing a reason for the burden, they are not entitled to summary judgment on Salahuddin's law-library claim.

The two arguments raised by the defendants are meritless and warrant only brief treatment. First, the defendants argue that "[t]he denial of attendance at religious services was the product of Salahuddin's own decision that going to the law library

each day was more important to him than attending the religious services." This is true, but beside the point. The pertinent question is why Salahuddin was put to this choice. One can imagine that a prison official could supply an answer to this question (time constraints, the cost of personnel, etc.), but we are provided with none.

Second, the defendants argue that summary judgment should be affirmed because Salahuddin does not present evidence that his law-library attendance was necessary to avoid prejudicing a particular legal claim. Again, this misses the point. Even if the activity triggering the denial of Salahuddin's ability to attend religious services was plainly irrelevant to his constitutional rights—such as having a second helping of dessert—our analysis would remain the same because the pertinent question remains unanswered: what penological interest lay behind the policy that excluded this inmate from religious services?

We hold that the facts, viewed in the light most favorable to Salahuddin, show a violation of his free-exercise rights: he was excluded from religious services without reason when he used the law library. Summary judgment on the basis of qualified immunity is not appropriate because it was clearly established law at the time of the alleged violations that religious exercise may not be denied without any reason. Along with defendant Stanton, Salahuddin identifies defendants Herbert, Goord, Wright, and Eagan as responsible for this alleged violation by virtue of their denial of Salahuddin's grievance. Salahuddin Decl. ¶ 81. Leaving the personal involvement of these defendants to the district court for analysis in the first instance, we vacate the judgment as to Stanton, Herbert, Goord, Wright, and Eagan on this claim.

## V. Salahuddin's Eighth Amendment Claim

Although we would not normally feel the need to review the legal framework for an Eighth Amendment claim complaining of cruel and unusual punishment, both parties' briefs reveal a partial misunderstanding of this framework (requiring us to recast some of their arguments), so we think it advisable to do so here before addressing in full their arguments. The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832, 844, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Yet not every lapse in medical care is a constitutional wrong. Rather, "a prison official violates the Eighth Amendment only when two requirements are met." *Id.* at 834, 114 S.Ct. 1970.

The first requirement is objective: the alleged deprivation of adequate medical care must be " 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Only "deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298, 111 S.Ct. 2321 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. *See Farmer*, 511 U.S. at 844–47, 114 S.Ct. 1970. Thus, "prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under

the Cruel and Unusual Punishments Clause," *id.* at 845, 114 S.Ct. 1970, and, conversely, failing "to take reasonable measures" in response to a medical condition can lead to liability, *id.* at 847, 114 S.Ct. 1970.

▮ Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. *See Helling v. McKinney,* 509 U.S. 25, 32–33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (holding that prisoners may complain about both current harm and "very likely" future harm). For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir. 2003). Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quotation marks omitted). In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Smith,* 316 F.3d at 185 (emphasis omitted). Thus, although we sometimes speak of a "serious medical condition" as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

▮ The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. *Wilson,* 501 U.S. at 300, 111 S.Ct. 2321 (reasoning that "some mental element must be attributed to the inflicting officer" before the harm inflicted can qualify as "punishment"). In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. *Id.* at 302, 111 S.Ct. 2321. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. *Farmer,* 511 U.S. at 839–40, 114 S.Ct. 1970. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. *Id.* at 836–37, 114 S.Ct. 1970. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. *Id.* at 835, 842, 114 S.Ct. 1970. But recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent. *Id.* at 835–37, 114 S.Ct. 1970; *see* Wayne R. LaFave, *Substantive Criminal Law* §§ 5.4(a)(1), 5.4(f), at 365–80 (2d ed.2003) (contrasting the risk of harm encompassed by the concepts of recklessness and negligence).

The charged official must be subjectively aware that his conduct creates such a risk. *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. Prison officials may, of course, introduce proof that they were not so aware, such as testimony that "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844, 114 S.Ct. 1970. Thus, in *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005), we held that a jury could infer the absence of a sufficiently culpable state of mind if the jury believed that the defendant denied the plaintiff medical treatment "because the defendant[ ] sincerely and honestly believed ... that applying [a prison policy mandating the denial of treatment] was, in plaintiff's case, medically justifiable." *Johnson,* 412 F.3d at 404. The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere. Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable.

## A. Dr. Piazza

Salahuddin reiterates on appeal his argument made to the district court that Dr. Piazza's cancellation of his liver biopsy constitutes cruel and unusual punishment in violation of the Eighth Amendment. Brief in Opp. to Defs.' Summ. J. Mot. 11. The parties dispute whether Piazza ever deprived Salahuddin of adequate medical care. We cannot, as a matter of law, find it reasonable for a prison official to postpone for five months a course of treatment for an inmate's Hepatitis C because of the possibility of parole without an individualized assessment of the inmate's actual chances of parole.

We also presume, for purposes of this appeal, that the five-month delay caused sufficiently serious harm. Salahuddin's brief cites evidence that he suffered pain between February and July 2001— the period between the cancellation of the biopsy by Piazza and its reinstatement by Wright—and thus we believe Salahuddin has made a sufficient case on appeal that the five-month delay was objectively serious. Because the defendants do not respond to this argument on appeal,[7] they have forfeited for purposes of this appeal any rebuttal that the delay was insufficiently serious. We agree with Salahuddin therefore that there is at least a genuine factual question as to the adequacy of Piazza's medical care. However, for the reasons that follow, we cannot conclude that that factual question constitutes a material issue precluding the grant of summary judgment, because where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial and cannot defeat a motion for summary judgment. *See, e.g., Celotex,* 477 U.S. at 322–32, 106 S.Ct. 2548.

As discussed, Salahuddin's claim against Piazza has both objective and subjective elements, and we conclude, upon reviewing the record evidence, that there is no genuine factual issue to be tried as to the subjective element, i.e. whether Piazza was aware of a substantial risk that his conduct would cause serious harm (and therefore acted with deliberate indifference). The evidence in Piazza's favor comes in the form of a letter, dated March 20, 2001, written by him to Lakeview Superintendent Moscicki in response to Sala-

---

7. The defendants purport to disclaim reliance on the objective prong on appeal, but they misunderstand that prong as turning on the severity of Hepatitis C generally and not the severity of the deprivation caused by any defendant. Thus, we rely on their forfeiture of the argument rather than their disclaimer.

huddin's grievance. In the letter, Piazza expresses his belief that because Hepatitis C leads to cirrhosis only over 20 to 30 years, Salahuddin "is in no immediate danger" and that "f[ro]m a medical standpoint[,] there is no urgency for [the cancelled liver biopsy]." This may have been an unsound conclusion absent an investigation into the progression of Salahuddin's Hepatitis C, but, as we have discussed, the mental-state inquiry does not include an objective-reasonableness test. Piazza's letter is direct evidence that he was not aware of a substantial risk that postponing the liver biopsy would cause serious harm.

The record contains no circumstantial evidence to contradict this conclusion. Unlike in *Johnson*, which concerned allegations similar to those here, there is no record evidence that any physician ever informed Piazza that it would be harmful to cancel the scheduled liver biopsy. *Cf. Johnson*, 412 F.3d at 404. And we find unpersuasive Salahuddin's point that Piazza did not take any steps to investigate the medical propriety of cancelling the biopsy because it draws on only an incomplete analogy to *Johnson*. A complete analogy to *Johnson*, which implements the idea of willful blindness, would require that someone have aroused Piazza's suspicion that postponing the biopsy rather than allowing treatment to proceed would be seriously harmful. *See id.* at 404–05. While willful blindness to a risk might suggest awareness of the risk, simple blindness does not, and leads only to a finding of unactionable negligence.

In sum, we hold that the record evidence does not raise a genuine factual question concerning whether Piazza acted with a sufficiently culpable mental state. On a motion for summary judgment, unlike on a motion to dismiss, *cf. McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir.2004), Salahuddin must actually point to record

evidence creating a genuine dispute as to those specific facts. This he has not done. Accordingly, summary judgment in Piazza's favor is proper.

**B. Dr. Wright**

Salahuddin argues in his reply brief that supervisory liability attaches to Dr. Wright for his role in promulgating the disputed DOCS policy. This claim fails because Salahuddin has not raised a triable question as to whether unconstitutional practices occurred under the guideline. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995) (holding that supervisory liability attaches if an official "created a policy or custom under which unconstitutional practices occurred").

**C. Unidentified Defendants**

Salahuddin tersely argues that summary judgment was inappropriate for other "secondary" reasons, namely, the denial of treatment while Salahuddin was in disciplinary segregation, the delay in the prescription and approval of Rebetron medication, and the choice of Rebetron, with its nationwide waiting list, rather than another treatment. Our response is similarly terse: Salahuddin's brief never ties any of these alleged deprivations of adequate medical care to the conduct of any defendant. Thus, even if these delays and decisions amount to inadequate medical care, there is no basis for vacating summary judgment as to any defendant.

**CONCLUSION**

For the foregoing reasons, we vacate the district court's judgment to the extent that it grants summary judgment (1) on Salahuddin's claims for damages and declaratory relief against (a) defendants Goord and Eagan on the joint-worship, keeplock, and law-library claims; (b) defendant Wright on the keeplock and law-library claims;

and (c) all DOCS-level defendants on the Qur'an/chaplain claim; and (2) on Salahuddin's claims for damages against (a) defendants Keane, Carrillo, and Turbush on the joint-worship claim; (b) defendants Walker and Cochran on the keeplock claim; (c) defendant Stanton on the law-library claim; and (d) all prison-level defendants on the Qur'an/chaplain claim. We affirm the judgment in the defendants' favor as to all other claims and remand the case for further proceedings consistent with this opinion.