**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 24, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RUSSELL M. BOLES,

        Plaintiff-Appellee,

v.

GARY D. NEET,

        Defendant-Appellant.

No. 05-1570

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 03-cv-557-PSF-OES)**

---

Submitted on the briefs:[*]

John W. Suthers, Attorney General, James X. Quinn, Assistant Attorney General, Office of the Colorado Attorney General, Denver, Colorado, for Defendant-Appellant.

Sheldon E. Friedman, Isaacson Rosenbaum P.C., Denver, Colorado, for Plaintiff-Appellee.

---

Before **PORFILIO**, **BALDOCK**, and **EBEL**, Circuit Judges.

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

**EBEL**, Circuit Judge.

Plaintiff Russell M. Boles is an Orthodox Jew serving time at the Freemont Correctional Facility in Cañon City, Colorado. He sued the warden, Gary D. Neet, under 42 U.S.C. § 1983 and the First Amendment after Warden Neet denied his request to wear certain religious garments while being transported to a hospital. Warden Neet moved for summary judgment based on qualified immunity, but the district court denied the motion, and he now appeals that determination. We exercise jurisdiction over this interlocutory appeal under 28 U.S.C. § 1291 and the *Cohen*[1] collateral order doctrine and AFFIRM.

I.

The relevant facts are not disputed. In March 2001, while he was incarcerated at FCF, Boles was scheduled to have eye surgery at an off-site hospital. On the day of his scheduled surgery, however, prison officials told him that prison regulations prohibited him from leaving the facility wearing his yarmulke and tallit katan.[2] He refused to remove the garments and forwent

---

[1]  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 515 (10th Cir. 1998) ("[T]he denial of a motion to dismiss based on qualified or absolute immunity is immediately appealable under the *Cohen* collateral order doctrine.").

[2]  Tallit katan, a hebrew expression referring to an undergarment bearing fringes or "tzitzit," is worn by some of the Jewish faith to fulfill the

(continued...)

-2-

having the surgery. On April 17, 2001, Boles sent a letter to Warden Neet requesting permission to wear his religious garments during transport to the hospital. Warden Neet responded by letter dated April 30, 2001, denying Boles's request based on the prison's transport regulation, AR 300-37 RD. That regulation provides that inmates classified "medium custody and above are [to be] transported in orange jumpsuits and transport shoes when being transported to a non-secure area, i.e. hospital." Aplt. App. at 179. Referring to this regulation, Warden Neet told Boles, "[a]lthough your religion may require you to wear certain items, those items will not be allowed during transport out of this facility." Id. at 163. Nonetheless, Boles remained steadfast in refusing to take off his yarmulke and tallit katan. As a result, his eye surgery was delayed until November 2002, by which point the prison regulations had been amended specifically to allow Jewish inmates to wear those items during transport.

Proceeding pro se in the district court, Boles sued Warden Neet under 42 U.S.C. § 1983 claiming that his actions violated Boles's First Amendment right to freely exercise his religion.[3] Warden Neet filed a motion to dismiss

---

[2](...continued)
commandment appearing in the Bible at the book of Numbers, ch. 15, verse 37. Boles alleges that under the Kitzer Shulchan Arukh, a code of Jewish law, he is forbidden to walk a distance of four cubits (between 12 and 16 feet) during daylight hours with his head uncovered and not wearing tzitzit.

[3]    Boles also brought claims under the Religious Land Use and Institutionalized Persons Act and the Eighth and Fourteenth Amendments, but
(continued...)

followed by a motion for summary judgment, arguing that Boles's First Amendment claim was barred by Warden Neet's qualified immunity from civil damages liability. By order dated November 30, 2005, the district court denied both motions, concluding that there was a material issue of fact concerning whether Warden Neet's conduct "was a reasonable restriction on plaintiff's free exercise of his religious practices." Aplt. App. at 248. More specifically, the court held that regulation AR 300-37 RD did not justify Warden Neet's actions.

> [N]othing in the policy prohibits the inmate from also wearing a head covering, such as a *yarmulke*, or an undergarment, such as a *tallit katan*. If there is a security issue associated with such garments, it is not apparent from the regulations.

*Id.* Also central to the court's decision was its broad interpretation of the constitutional right involved, which the court framed as the free exercise of religion. The court concluded that whether Warden Neet violated that right could not be decided on summary judgment.

> While a defendant charged with a constitutional violation receives qualified immunity when the right asserted is not clearly established, the right that has been established does not have to [be] so fact specific that it is identical to what is alleged in the case at issue, as defendant appears to argue here. To overcome a motion to dismiss the plaintiff must articulate a constitutional right which the defendant violated. To unreasonably limit plaintiff's free exercise of religion is a violation.

---

[3](...continued)
those claims have been dismissed, and the propriety of their dismissal is not before us.

-4-

*Id.* at 245 (quotation omitted).  On appeal, Warden Neet argues that in framing the constitutional right so broadly, the district court impermissibly removed the defense of qualified immunity.  He also argues that prison inmates like plaintiff enjoy no clearly established constitutional right to wear religious garments either on the prison grounds or in transport outside of the facility.  Accordingly, he contends that he is entitled to qualified immunity with respect to plaintiff's First Amendment claim.

## II.

The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When the district court denies a motion asserting the qualified immunity defense, we review its decision de novo.  *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998).  Our review is guided by the Supreme Court's instructions concerning the proper sequence in which to analyze the requisites of a qualified immunity defense.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  First, we must consider whether the plaintiff's factual allegations show that the official's conduct violated a constitutional right.  *See id.* at 201.  If the assumed facts do not establish a constitutional violation, the defendant is entitled to

summary judgment. If, on the other hand, a violation can be shown, "the next, sequential step is to ask whether the right was clearly established." *Id.*

*A. Did Boles Allege a Constitutional Violation?*

In taking the first step of the *Saucier* analysis, we are mindful of the delicate balance that has been recognized between prisoners' constitutional guarantees and the legitimate concerns of prison administrators. In *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), the Supreme Court acknowledged that although "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," *id.* at 348 (quotation omitted), convicted prisoners nonetheless "retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion," *id.* (citation omitted). The Court emphasized, however, that in evaluating a challenged prison regulation, appropriate deference must be afforded to prison administrators "who are actually charged with and trained in the running of the particular institution under examination." *Id.* at 349 (quotation omitted). Accordingly, the Court distinguished prison regulations from other laws alleged to violate fundamental constitutional rights, holding that the former must be judged under a less restrictive reasonableness test: "'[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

The same year it decided *O'Lone*, the Court decided *Turner*, which, in part, struck down as unreasonable a prison regulation banning inmate marriages. It was clear after *Turner* that the question of whether a prison regulation reasonably curtails constitutional rights requires close examination of the facts of each case, the specific regulation under review, and the alleged justifications for it. To assist the lower courts in making the reasonableness determination, the Court identified the following factors:[4]

> (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) (citing *Turner*, 482 U.S. at 89-91). As other courts have pointed out, the first *Turner* factor is actually more of an "element" than a factor in the sense that it "is not simply a consideration to be weighed but rather an essential requirement." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006); *see also Sutton v. Rasheed*, 323 F.3d

---

[4] Although plaintiff is not challenging a prison regulation per se, but rather Warden Neet's individual actions, *Turner* is no less applicable. As the Second Circuit usefully recognized in *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006), "[a]n individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise."

236, 253 (3d Cir. 2003) ("The first factor is foremost in the sense that a rational connection is a threshold requirement . . . .") (quotation omitted). To satisfy the first *Turner* factor, "the prison administration is required to make a minimal showing that a rational relationship exists between its policy and stated goals." *Beerheide*, 286 F.3d at 1186.

This framework established in *Turner* and *O'Lone*, which seeks to balance prisoners' constitutional rights against the valid concerns of prison administrators, is sharply at odds with the test formulated three years later in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990). There the Supreme Court held that the free exercise clause does not exempt an individual from complying with "a valid and neutral law of general applicability" even if the law impinges on that individual's religious practices. *Id.* at 879. *Smith* was not a prison case and it did not purport to limit or overrule *Turner* and *O'Lone*, but many courts have questioned its effect, if any, on the standard for evaluating prisoner free exercise claims articulated in those cases. Some courts that have addressed the issue have concluded that "the proper standard to apply in prisoner cases challenging restrictions on the free exercise of religion is supplied by the Supreme Court's decision in *Turner*, not by [*Smith*]." *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001); *see also Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (seeing no reason to depart from *Turner*); *Salaam v. Lockhart*, 905 F.2d 1168, 1171 n.7 (8th Cir. 1990) (holding that *Smith* did not

-8-

affect analysis). Other courts have recognized the possible implications of *Smith* in the prison context, but have gone on to utilize the *Turner/O'Lone* balancing framework because the defendant did not argue for *Smith's* applicability. *Levitan v. Ashcroft*, 281 F.3d 1313, 1318-19 (D.C. Cir. 2002) (collecting cases); *Salahuddin,* 467 F.3d at 274 n.3; *Hakim v. Hicks*, 223 F.3d 1244, 1247 n.13 (11th Cir. 2000). We are aware of only one case in which the court analyzed a prisoner's free exercise claim under *Smith*, and even in that case, the court also held that the challenged regulation passed scrutiny under *O'Lone*. *See Hines v. S.C. Dep't of Corrs.*, 148 F.3d 353, 357 (4th Cir. 1998). This court has yet to address the issue squarely, but like our sister circuits we have continued to employ the *Turner/O'Lone* balancing framework in prison cases even after *Smith*. *See Beerheide*, 286 F.3d at 1184-86; *Kikumura v. Hurley*, 242 F.3d 950 (10th Cir. 2001). In this case, both parties appear to agree that the *Turner/O'Lone* standard governs as neither of them has argued for *Smith's* application. Accordingly, without deciding the issue, we will apply the *Turner/O'Lone* balancing framework to Boles's First Amendment claim.

With this backdrop we return to the first *Saucier* question: has plaintiff alleged facts showing the violation of a constitutional right? To meet his burden at this stage, Boles had to show that Warden Neet's conduct substantially burdened his sincerely-held religious beliefs. *Salahuddin*, 467 F.3d at 274-75. If so, Warden Neet then bore "the relatively limited burden of identifying the

legitimate penological interests that justif[ied] the impinging conduct." *Id.* at 275. We think Boles made the requisite showing at step one. His Amended Complaint alleged that according to the code of Jewish Law, "Jewish males are required to wear a head covering at all times," Aplt. App. at 44, and that "observant Jews may not walk even as much as four cubits (approximately six feet) without wearing [the Tallit Katan]," *id.* He further alleged that the observance of these commandments is of "cosmic or life and death importance," *id.*, and does not interfere with prison security, *see id.* at 45.

Therefore, the burden shifted to Warden Neet to identify the legitimate penological interests served by his decision to forbid Boles from wearing his religious garments. Warden Neet has identified nothing, however, and we could find no evidence in the record of any penological objectives served by his actions.[5] On appeal, Warden Neet cites several cases upholding against constitutional challenges prison regulations restricting the use of religious clothing out of concern that the clothing could be used to smuggle contraband. *See Muhammad v. Lynaugh*, 966 F.2d 901, 902-03 (5th Cir. 1992) (upholding

_____

[5] Although Warden Neet submitted an unredacted version of regulation AR 300-37RD to the district court, all but a sliver of it was returned in response to his motion to seal the document and was not included in the record on appeal. Perhaps the full regulation sets forth legitimate security or other concerns underlying the prison's religious garment and transport regulations. Since Warden Neet did not include it in the appellate record, however, we have no way of knowing.

regulation restricting Muslim inmates' wearing of Kufi caps); *Young v. Lane*, 922 F.2d 370, 376 (7th Cir. 1991) (yarmulkes); *Benjamin v. Coughlin*, 905 F.2d 571, 579 (2d Cir. 1990) (Rastafarian crowns); *Butler-Bey v. Frey*, 811 F.2d 449, 451 (8th Cir. 1987) (fezes); *Rogers v. Scurr*, 676 F.2d 1211, 1216 (8th Cir. 1982) (prayer caps and robes).  But in each of those cases, the court made its decision based on the prison's evidence that its regulation responded to valid security concerns.  In *Muhammad*, for example, the Fifth Circuit upheld a regulation restricting the use of Kufi caps only after "a lengthy evidentiary hearing," 966 F.2d at 901, at which senior corrections officers testified that prison security was the impetus behind the challenged regulation.  "They testified that weapons, such as shanks and razor blades, could easily be secreted inside a Kufi cap."  *Id.* at 902.  The court was "persuaded that the evidence introduced at the hearing established that the regulations restricting the use of Kufi caps . . . bear a reasonable relationship to the legitimate penological interest of prison security." *Id.*  Likewise, in *Butler-Bey*, the Eighth Circuit noted with approval the testimony of prison officials that smuggling contraband was a problem at the prison and that religious headgear could be used for smuggling.  811 F.2d at 451.

Warden Neet cannot base his entitlement to qualified immunity purely on the outcome of these other cases.  While his actions may have been motivated by a legitimate concern that Boles's religious garments could be used to smuggle contraband into and out of the prison, he points to nothing in the record to that

effect, and our own review of the record failed to reveal such evidence. As the *Salahuddin* court noted when faced with similar circumstances, "[n]either the district court nor this court can manufacture facts out of thin air." 467 F.3d at 275. Without record support, we cannot conclude that Warden Neet's actions were justified by security concerns or any other valid penological objectives. We recognize that Warden Neet may adduce additional facts in support of a later summary judgment motion or at trial. At this stage of the litigation, however, the uncontroverted factual allegations viewed in the light most favorable to Boles show that Warden Neet placed substantial burdens on Boles's free exercise rights with no valid penological justification. Boles therefore met his burden at the first step of the *Saucier* analysis.

*B. Was the Constitutional Right Clearly Established?*

Turning to step two, Warden Neet argues that even if Boles alleged a constitutional violation, he is entitled to qualified immunity because an inmate's unrestricted right to wear religious garments was not clearly established at the time of the alleged violation. Boles counters that the proper focus should be on whether it was clearly established that inmates retain the constitutional right of free exercise, not on the right's narrow application to religious garments.

The parties' disagreement about how broadly to define the constitutional right is understandable. As we have previously noted, striking the right balance is crucial to the qualified immunity analysis. *See Melton v. City of Okla. City*, 879

F.2d 706, 729 n.37 (10th Cir. 1989), *vacated in part en banc*, 928 F.2d 920 (10th Cir. 1991). "Too general a formulation would 'convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). On the other hand, defining the constitutional right too narrowly "would render the defense available to all public officials except in those rare cases in which a precedential case existed which was on all fours factually with the case at bar." *Id.* (quotations omitted). In sum, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

Our task is to evaluate Warden Neet's assertion of qualified immunity in the context of the circumstances that he faced without being too constrained by the particular facts of the case. *See Melton*, 879 F.2d at 729. Fortunately, the analysis in this case is uncomplicated. In support of his summary judgment motion, Warden Neet argued that his decision to deny Boles's request to wear religious garments during transport was based solely on prison regulations in effect at the time.

> 21.   . . . I uniformly applied the religion and transport regulations
>        as they existed at the time.
> 22.   I did not discriminate against inmate Russell Boles based on
>        his religion. I applied existing regulations to Boles and all
>        offenders uniformly.

Neet Aff., Aplt. App. at 159. We appreciate Warden Neet's position that he did not intend to violate Boles's constitutional rights, but he is not immune from liability simply because he acted in accordance with prison regulations.[6] The Supreme Court clearly established in *Turner* that prison regulations cannot arbitrarily and capriciously impinge on inmates' constitutional rights. To be valid, a regulation must be "reasonably related to legitimate penological interests." 482 U.S. at 89. Therefore, Warden Neet's actions were reasonable and he is entitled to qualified immunity only if the regulation that he relied on was reasonably related to a legitimate penological interest. Since, as we have already held, there is nothing in the record to indicate as much, he has not established the defense of qualified immunity.

The district court's order is AFFIRMED.

---

[6] We recognize that one of the relevant factors in evaluating the reasonableness of Warden Neet's actions is whether he relied on a regulation or official policy that explicitly sanctioned his conduct. *See Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003). But the regulation at issue here, AR 300-37 RD, at most only implicitly sanctioned his conduct. It states that inmates are to be transported in orange jumpsuits and transport shoes. In our view, whether it implicitly forbids the wearing of other items depends on the purpose behind the regulation. If its purpose is to easily identify escaped convicts and prohibit them from moving quickly on foot, reading into the regulation a prohibition against yarmulkes and religious undergarments makes no sense. On the other hand, if the purpose is preventing the smuggling of contraband, the implicit prohibition against wearing religious garments may make sense. Warden Neet failed to make a showing either way.

-14-