**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 9, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LYNN BUCK; ALMA ROSA
SILVA-BANUELOS; DENIS
DOYON; LUCY GILSTER (by her
next friend, JENNIE LUSK); BRIAN
HANEY; ALICIA KISNER (by her
next friend, LISA KISNER);
MICHAEL KISNER; LANE
LECKMAN; MARIA SANTELLI;
SUSAN SCHUURMAN; CHRISTINA
MAYA TRAFTON; CURTIS
TRAFTON; NICK
WECHSELBERGER,

      Plaintiffs - Appellees,

v.

      No. 07-2118

CITY OF ALBUQUERQUE; MAYOR
MARTIN CHAVEZ, in his individual
capacity; DEPUTY POLICE CHIEF
RAY SCHULTZ, in his individual
capacity; ALBUQUERQUE POLICE
OFFICERS RAYMOND DEFRATES,
MICHAEL FISHER, JAMES LEROY
FOX, NICHOLAS GONZALES,
ALLEN S. HANCOCK, SGT.
STEVEN HILL, CHARLES LOPEZ,
DANIEL S. MAGETTERI, JAMES
MONTOYA, SGT. SHAWN
O'CONNELL, PABLO PADILLA and
JAMES PERDUE, in their individual
capacities,

      Defendants,

and

CAPTAIN JOHN GONZALES, in his official and individual capacities,

Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CIV-04-1000-JAP/DJS)**

Jerry A. Walz, Walz and Associates, Cedar Crest, NM for Defendant-Appellant.

Carolyn M. Nichols, Rothstein, Donatelli, Dahlstrom, Hughes, Schoenburg & Bienvenu, LLP, Albuquerque, NM (with Mary Louise Boelke, Kennedy & Oliver, Albuquerque, New Mexico on the brief), for Plaintiffs-Appellees.

Before **HENRY**, Chief Judge, **BRISCOE**, and **HOLMES**, Circuit Judges.

**HENRY**, Chief Judge.

In this fact-bound interlocutory appeal, Captain John Gonzales appeals the district court's denial of his motion for summary judgment as to six claims against him, each originating in events that transpired during an antiwar rally at the University of New Mexico ("UNM"). Captain Gonzales raises six challenges to the district court's order: the district court erred when it denied summary judgment as to plaintiffs' claims regarding (1) unconstitutional arrest; (2) excessive force; (3) First Amendment infringement; (4) retaliatory prosecution; (5) malicious prosecution; and (6) malicious abuse of process under New Mexico

law.  We hold that the district court was correct when it determined that Capt. Gonzales was not entitled to qualified immunity as to whether Capt. Gonzales is liable under Section 1983 for (1) directing the arrests of and (2) authorizing the use of force against certain of the Plaintiffs.  We also agree that the rights underlying these claims were clearly established.  As to the (3) First Amendment retaliation claim, because the right to peaceful assembly and freedom of speech is clearly established, Capt. Gonzales's challenges to the district court's findings fail.  We are unable to review the balance of Capt. Gonzales's challenges, because our jurisdiction is limited.  Specifically, we are without jurisdiction to consider factual disputes as to the excessiveness of the force officers used against the protestors, or the sufficiency of the evidence underlying the claims involving First Amendment retaliation, retaliatory prosecution, or malicious prosecution. Finally, we decline to exercise pendent state law jurisdiction over the state law tort claim of malicious abuse of process.

## I. BACKGROUND

A.  Facts

We need not restate the background underlying the antiwar protest, as our related opinion in *Fogarty v. Gallegos*, 523 F.3d 1147, 1150-53 (10th Cir. 2008), has already done so.  In our analysis of Capt. Gonzales's challenges, we will supplement this factual background as needed, particularly as to the individual plaintiffs.

B.    Procedural History

The sixteen Plaintiffs filed a complaint in New Mexico state court, raising nine counts against either the officers, Capt. Gonzales, the City, or a combination of these defendants, alleging violations of their rights under 42 U.S.C. § 1983, and various state torts.  The claims that pertain to Capt. Gonzales were (1) wrongful seizure and arrest (brought by Plaintiffs Alma Rosa Silva-Banuelos, Michael Kisner, and Denis Doyon, the "Arrested Plaintiffs"); (2) excessive use of force (brought by Plaintiffs Camille Chavez, Mr. Kisner, and Mr. Doyon, the "Excessive Force Plaintiffs"); (3) suppression of rights to freedom of expression and assembly; (4) retaliatory prosecution (brought by the Arrested Plaintiffs); (5) malicious prosecution (brought by the Arrested Plaintiffs); (6) the state law tort of malicious abuse of process (brought by the Arrested Plaintiffs); and (7) supervisory liability for violations of constitutional rights.

The defendants removed the case to federal court, and Capt. Gonzales sought summary judgment as to each of the above claims.  The district court denied summary judgment to Capt. Gonzales on the unreasonable seizure and arrest claims relating to the Arrested Plaintiffs.  The district court found that Capt. Gonzales undisputedly "played a role in developing the APD's plan for the protest and acted as the incident commander in charge."  Aplts' App. vol. VIII, at

2009.[1]  He expected his officers to take action only when in receipt of a specific directive from him.  He ordered the arrest of five to seven provocateurs, and, rather than follow APD policy of citing and releasing the arrestees, he ordered his officers to book the arrested persons downtown.

The court noted Capt. Gonzales's direction "set in motion a series of events that he knew or reasonably should have known would cause his officers to violate Plaintiffs Chavez, Doyon, and Michael Kisner's constitutional rights when he authorized the use of pepper ball rounds, ordered Plaintiff Doyon's arrest, and ordered his officers to sweep people [including Mr. Kisner] from the front of the Frontier restaurant." *Id.* at 2035.  As to the remaining Plaintiffs, the court noted that any injuries were de minimis at most, and there was no evidence that Capt. Gonzales's command to use force was malicious.

The district court granted summary judgment to Capt. Gonzales as to the excessive force claims that related to the officers' force used against all Plaintiffs except for Ms. Chavez, Mr. Doyon, and Mr. Kisner.  After succumbing to tear gas and feeling immobile, Ms. Chavez, circled by APD officers, laid down in the street while an officer repeatedly fired non-lethal pepper ball rounds at her.  During Mr. Doyon's arrest, which he did not resist, he was pushed face down on the pavement, kneed in the back, pressed face forward on the hood of a police car,

---

[1]  The Appellant's appendix in this case is consolidated with that of companion case *Buck v. City of Albuquerque, et al.*, No. 07-2117, 2008 WL 2883909 (July 28, 2008).

and exposed to tear gas while handcuffed in a police van. Mr. Kisner, who similarly did not resist arrest or attempt to flee, was hit repeatedly by an officer's horse, sprayed with pepper spray, pinned between two horse-mounted officers, kicked in the back, and shaken violently by the strap of his shoulder bag. The district court determined each of these three plaintiffs demonstrated sufficient evidence that she or he was subjected to excessive force in violation of the Fourth Amendment.

The district court denied summary judgment to Capt. Gonzales on the First Amendment retaliation claim, noting that "there is some circumstantial evidence that [Capt.] Gonzales may have been motivated to interfere with Plaintiffs' First Amendment rights." *Id.* at 2042. Finally, the district court granted summary judgment to Capt. Gonzales as to Plaintiffs' § 1983 claims against him in his official capacity, noting these claims were redundant because the plaintiffs asserted the same claims against the City of Albuquerque. *See id.* at 2051; *id.* vol. VII, at 1730-31.

The district court also granted Capt. Gonzales summary judgment as to Mr. Doyon's and Mr. Kisner's § 1983 malicious prosecution claims. Applying the common law elements of malicious prosecution under *Pierce v. Gilchrist*, 359 F.3d 1279, 1291-97 (10th Cir. 2004) ((1) initiation of the original action, (2) termination of the original action in favor of plaintiff; (3) lack of probable cause to support arrest, continued confinement, or prosecution; and (4) malice), the

court determined that neither Mr. Doyon nor Mr. Kisner could establish the favorable termination element, because the state dismissed the charges against them only after they completed an alternative sentencing program, and thus the cases did not terminate in their favor. However, the court found that Ms. Silva-Banuelos's claim survived summary judgment because the state court dismissed the charges against her. Because in her case the court found evidence of each of the factors of malicious prosecution, as well as evidence of an affirmative link between Capt. Gonzales and her prosecution, it denied summary judgment and qualified immunity to him on this claim.

Finding that Capt. Gonzales "directly supervised his officers' conduct and issued directives as he followed the progress of the . . . protest," and that he "personally participated in, ordered, and acquiesced in the arrests" of the Arrested Plaintiffs, the district court also denied summary judgment to him on the Arrested Plaintiffs' § 1983 retaliatory prosecution claims. Aplts' App. vol. VIII, at 2009. Similarly, the court determined that the Arrested Plaintiffs could proceed with their state law malicious abuse of process tort claims.

Capt. Gonzales and the Officers appealed, and the Plaintiffs filed a Motion for District Court Certification of Defendants' Interlocutory Appeals as Frivolous. The district court appeared to disagree, reading some of Capt. Gonzales's challenges (*i.e.*, supervisory liability, retaliatory motive) as being based on the argument that, even under the Plaintiffs' version of facts, he did not violate

clearly established law, and thus, according to the district court, these issues appeared to be immediately appealable.

## II. DISCUSSION

Capt. Gonzales challenges the district court's denial of summary judgment as to the claims for (1) wrongful seizure and arrest; (2) excessive force; (3) First Amendment retaliation; (4) retaliatory prosecution; (5) malicious prosecution; and (6) the state tort of malicious abuse of process. For the reasons explained below, we affirm the denial of summary judgment as to the claims based on wrongful seizure and arrest, excessive force, and First Amendment retaliation claims. We dismiss the remaining claims for lack of jurisdiction, and we decline to exercise pendent jurisdiction over the state law tort claim.

A.    Jurisdiction

Our jurisdiction is limited. As we stated in the related appeal in *Fogarty v. Gallegos*:

> Although orders denying summary judgment are ordinarily not appealable, we have interlocutory jurisdiction over denials of qualified immunity at the summary judgment stage to the extent that they "turn [ ] on an issue of law." *Mitchell*, 472 U.S. at 530. Under this limited jurisdiction, we may review the district court's abstract legal conclusions, such as whether the law was clearly established at the time of the alleged infraction. *See Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). At this stage, however, *we are not at liberty to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide*, *or that a plaintiff's evidence is sufficient to support a particular factual inference. . . .* Those facts explicitly found by the district court, combined with those that it likely

assumed, then form the universe of facts upon which we base our legal review of whether defendants are entitled to qualified immunity.

523 F.3d at 1153 (some citations and footnote omitted) (emphasis added). "Our jurisdiction also extends to situations where a defendant claims on appeal that accepting the plaintiff's version of the facts as true, he is still entitled to qualified immunity." *York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008) (citing *Johnson v. Martin*, 195 F.3d 1208, 1214 (10th Cir. 1999) ("[I]f a defendant's appeal of the denial of a motion for summary judgment is based on the argument that, even under the plaintiff's version of the facts, the defendant did not violate clearly established law, then the district court's summary judgment ruling is immediately appealable.")).

B.      Standard of review

We review de novo a district court's decision to deny a summary judgment motion that asserts qualified immunity. *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

However, "[b]ecause of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." *Price-Cornelison v.*

*Brooks*, 524 F.3d 1103, 1108 (10th Cir. 2008). "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Boles*, 486 F.3d at 1180 (internal quotation marks omitted). In response to Capt. Gonzales's qualified immunity-based motion for summary judgment, the Plaintiffs must satisfy a heavy two-part burden, showing that (1) the defendant violated a constitutional or statutory right and (2) the right was clearly established at the time of the defendant's unlawful conduct. *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Furthermore,

> We have held that, for a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. The Supreme Court has explained that officials can still be on notice that their conduct violates established law even in novel factual circumstances.

*Cortez v. McCauley*, 478 F.3d 1108, 1114-15 (10th Cir. 2007) (en banc) (citations, quotations, alterations omitted).

C. Capt. Gonzales's Challenges

1. Unreasonable Seizures and Arrests

Capt. Gonzales's first challenge is to the district court's conclusion that he was not entitled to summary judgment relating to the seizures and arrests of the

Arrested Plaintiffs. As we explain below, Capt. Gonzales is entitled to qualified immunity (and, thus summary judgment) unless the Arrested Plaintiffs can establish (1) Capt. Gonzales violated a constitutional right, and (2) the right he violated was clearly established at the time. *Mecham*, 500 F.3d at 1204. Prior to analyzing Capt. Gonzales's challenge, however, we briefly summarize the arrest of each Arrested Plaintiff, construing the facts in the light most favorable to the Plaintiffs.

### a. Seizures of Arrested Plaintiffs

#### i. Alma Rosa Silva-Banuelos

While in front of the Baskin Robbins on Central Avenue, Ms. Silva-Banuelos saw a group of protestors sit down. Officers surrounded the protestors and she saw one officer jab a protestor with a baton. Later, at the intersection of Central Avenue and Yale Boulevard, she stood on the street near the curb in front of a parked car. She joined in chanting "police strike" and she told officers that the crowd was being treated poorly, to which the horse-mounted officers laughed and charged forward. She stepped back and made peace signs in front of the Papa John's restaurant. The horse-mounted officers encircled her and told her not to move. An officer twisted her arms back and forced her to walk to the police car where she was handcuffed. Ms. Silva-Banuelos did not directly interact with Capt. Gonzales, although he is seen in a videotape apparently directing her arrest. (Capt. Gonzales denies authorizing her arrest, but concedes, for purposes of

-11-

summary judgment, that he must assume this fact to be true. Reply Br. at 8, n.1.) The police charged her with resisting, evading, or obstructing on officer, and public nuisance. All charges were dismissed upon the prosecutor's subsequent motion.

### ii. Denis Doyon

Mr. Doyon joined his friends playing samba music on percussion instruments with his ringing of a cowbell. He witnessed officers shoving some protestors with batons, and between the intersection of Harvard Drive and Cornell Drive, "[h]e saw one officer with a rifle that appeared to shoot beanbag rounds." Aplts' App. vol. VIII, at 1969. As he watched, "[t]he officer aimed the rifle at a young man who was walking east on the sidewalk, and he heard the officer say that if the man did not move faster, he would shoot him." *Id.*

He believed "[t]he drumming appeared to ease some of the tension in the crowd[,] and many people began to smile, sing, and dance." *Id.* at 1969-70. He did not "hear any orders to leave the intersection or warnings about the use of chemical agents," nor did anyone tell him to stop drumming. *Id.* at 1970. Capt. Gonzales then ordered the officers to remove the drums and to arrest the drummers.

Mr. Doyon watched as "officers in riot gear immediately entered the crowd, passing several people in order to apprehend four of the drummers." *Id.* vol. VIII, at 1970. "Two officers grabbed him by the shoulders, causing him to trip." *Id.*

The officers "dragged him from the crowd and pushed him face down onto the pavement," where "[o]ne of the officers placed his knee on the small of [his] back, pinning him to the ground." *Id.* Though he did not resist, the officers pushed Mr. Doyon "forward onto the hood of a police car and handcuffed him with plastic flexicuffs." *Id.*

As he was being taken to a police van, "he saw an officer walking toward the crowd at Central Ave. and Cornell Dr. with a tear gas canister launcher." *Id.* Upon entering the van, "[he] heard a loud pop followed by the sounds of people in the crowd screaming and yelling." *Id.*

"Shortly thereafter, tear gas began wafting into the van, burning [his] eyes, throat, and nasal passages" and causing him to have "difficulty breathing." *Id.* Police officers closed the door to the van, sealing in the tear gas, and "[o]ther protestors in the van began to panic because they were trapped in a van permeated with tear gas with no way to get fresh air." *Id.* The charges were dismissed against him after he "successfully completed an alternative sentencing program," which was a one-day informational citizenship program. *Id.* at 1971.

iii. Michael Kisner

Mr. Kisner attended the demonstration along with his sister, Alicia Kisner, and his mother, Lisa Kisner. He witnessed officers use pepper spray and batons to keep the crowd moving, he was subjected to pepper ball rounds, saw the launching of tear gas, and saw officers throw drummers to the ground. After witnessing a female protester

-13-

collapse after an officer fired beanbag rounds at her from close range, he and other protestors went to assist her. An officer shot him with beanbag rounds in the shoulder and chest.

He proceeded to the corner of Central Avenue and Cornell Avenue and joined a group of protestors chanting "shame" to the police. *Id.* at 1978. A horse-mounted officer ordered everyone to leave. Mr. Kisner and others questioned why they could not be on the sidewalk. Mr. Kisner also explained that his car was north of the demonstration, and that he needed to proceed in that direction in order to depart. The officer refused to let Mr. Kisner continue going north and, after feeling the burning of pepper spray, Mr. Kisner turned around on Cornell Avenue.

Then, two horse-mounted officers approached him on each side, grabbed his backpack and thrust him to the ground. Another officer led him to a police van. Mr. Kisner was charged with Resisting, Evading, or Obstructing an Officer in violation of N.M. Stat. Ann. § 30-22-1 and Public Nuisance in violation of N.M. Stat. Ann. § 30-8-1. After the completion of a one-day citizenship information program, the charges against Mr. Kisner were dismissed.

### b. Qualified immunity

Having summarized the three arrests, we consider Capt. Gonzales's argument that he is entitled to qualified immunity. While we are mindful that Arrested Plaintiffs bear the burden of showing that Capt. Gonzales violated their clearly established constitutional rights, *Mecham*, 500 F.3d at 1204, we note that he offers four separate arguments in

-14-

support of his purported entitlement to qualified immunity. First, he argues that he cannot be liable because he was not personally involved in the seizures or arrests of the Arrested Plaintiffs. Second, he contends that the seizures were not unreasonable because there was a reasonable basis to believe that probable cause existed to arrest each plaintiff. Third, he urges that, even if the officers did not have probable cause to arrest, he is protected by qualified immunity's second prong, because the right of the Arrested Plaintiffs was not clearly established. Finally, he argues that he should not be held liable for the arrests as a supervisor. For reasons explained below, we find that the Arrested Plaintiffs have met their burden and that each of Capt. Gonzales's arguments is unpersuasive.

### i. Constitutional Violation

Viewing the facts in the light most favorable to the Arrested Plaintiffs, as we must, we consider whether they have established that Capt. Gonzales may have violated their constitutional rights. *Mecham*, 500 F.3d at 1204; *see also Saucier*, 533 U.S. at 201; *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004). The first two of Capt. Gonzales's aforementioned contentions – that (a) he did not violate the Arrested Plaintiffs' constitutional rights because he was not personally involved in their arrests or seizures, and (b) the arrests were supported by probable cause – must be considered under the first prong of our qualified immunity analysis. We will examine each of Capt. Gonzales's arguments in turn.

### (a) Personal involvement

-15-

"For liability under section 1983, direct participation is not necessary. Any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable. The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990). In this case, the district court found that the Arrested Plaintiffs established the requisite causal connection between alleged deprivation of their constitutional rights and Capt. Gonzales's actions. We agree with the district court's conclusion.

To begin, viewing the facts in the light most favorable to Ms. Silva-Banuelos, the video footage of her arrest places Capt. Gonzales nearby, strongly suggesting that Capt. Gonzales was aware of, if not the director of, her arrest. Thus, he was at least on the scene directing, if not even more personally involved in her arrest. *See Fischer v. Forestwood Co.,* 525 F.3d 972, 978 (10th Cir. 2008). The district court also determined that Capt. Gonzales was intimately and personally involved in the preparation and planning of the APD response to the demonstration, including measuring the amount of force the officers used and the arrests they made:

> It is undisputed that Defendant Gonzales played a role in developing the APD's plan for the protest and acted as the incident commander in charge of the police response to the March 20, 2003 demonstration. Consequently, he was the point of contact for, and the immediate supervisor of, all police officers assigned to duty at the demonstration. *By his own admission, Defendant Gonzales did not expect his officers to take independent action unless they received specific directives, and this was particularly true concerning the use of force.* As the incident commander, Defendant Gonzales

-16-

directly supervised his officers' conduct and issued specific directives as he followed the progress of the march and the protest.

When the march neared the conclusion after the demonstrators returned to Central Avenue, Defendant Gonzales *ordered the arrest and removal of five to seven individuals who were acting as provocateurs*. After the crowd returned to the intersection of Central Avenue and Cornell Drive, Defendant Gonzales ordered his officers to seize the percussion instruments that certain protestors were playing and directed his officers *to make arrests if necessary*. Toward the end of the protest, Defendant Gonzales deviated from the APD's general policy of citing and releasing demonstrators and ordered his officers to book the arrested persons downtown.

Aplts' App. vol. VIII, at 2009 (emphasis added). We note that Capt. Gonzales also ordered his officer to take the unusual step of booking the arrestees downtown, rather than citing them and releasing them.

The district court also found that Capt. Gonzales's authorization of the provocateurs' arrests and of other "necessary" arrests encompassed the arrests of Mr. Doyon and Mr. Kisner. Further, the district court found that there was sufficient evidence of Capt. Gonzales's direct participation in Mr. Doyon's seizure and arrest. We agree with the district court that, viewing the facts favorably to the Plaintiffs, Capt. Gonzales's personal involvement was the catalyst of the chain of events leading to Ms. Silva-Banuelos's and the two other Arrested Plaintiffs' arrests. *Id.* at 2008 (citing *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996) ("A plaintiff may satisfy this standard by showing the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance.")).

-17-

(b) Probable cause

Having found that Arrested Plaintiffs have adequately established a causal connection between Capt. Gonzales's actions and their arrests, we turn to Capt. Gonzales's second argument: that there was a reasonable basis to believe that probable cause existed to arrest the Arrested Plaintiffs.

The Fourth Amendment protects the right of individuals to be free from improper arrest and detention. U.S. CONST. amend. IV ("The right of people to be secure in their persons . . . against unreasonable seizures . . . shall not be violated."). "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed," *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), and the "validity of the arrest does not depend on whether the suspect actually committed a crime." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *see also Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007) ("Probable cause only requires a probability of criminal activity, not a prima facie showing of such activity."). Accordingly, when a warrantless arrest is the subject of a § 1983 action, in order to succeed, a plaintiff must prove that the officer(s) lacked probable cause. *Id.*, 490 F.3d at 813-14.

"[W]hen an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable." *Virginia v. Moore*, 128 S. Ct. 1598, 1604 (2008).

"Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983)*; Beck v. Ohio*, 379 U.S. 89, 91 (1964). The inquiry "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," *Devenpeck*, 543 U.S. at 152, where supported by "reasonably trustworthy information." *Beck*, 379 U.S. at 91. We determine probable cause from the totality of the circumstances taking into account both inculpatory as well as exculpatory evidence. *Wilder*, 490 F.3d at 814. In general, "it is a jury question in a civil rights suit whether an officer had probable cause to arrest." *DeLoach v. Bevers*, 922 F.2d 618, 623 (10th Cir. 1990). In addition, "the legality of an arrest may be established by proving that there was probable cause to believe that the plaintiff had committed a crime other than the one with which [s]he was eventually charged, provided that the crime under which the arrest is made and [the] crime for which probable cause exists are in some fashion related." *Gassner v. City of Garland, Tex.*, 864 F.2d 394, 398 (5th Cir. 1989) (internal quotation marks omitted); *see Devenpeck*, 543 U.S. at 149 ("[T]he subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); *Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006) ("All that matters is whether [the officer] possessed knowledge of evidence that would provide probable cause to arrest her on *some* ground." (emphasis in original)).

Capt. Gonzales argues that his conduct, to the extent it impacted the arrests, stemmed from his and his officers' collective knowledge of the existence of probable cause to arrest for each of the charged violations, and of probable cause to arrest each of the three Arrested Plaintiffs for various uncharged violations: the Parade Ordinance, § 7-3-1 *et seq.*, Revised Ordinances of Albuquerque ("ROA"); prohibiting pedestrians on roadways, N.M. STAT. ANN. § 66-7-339; walking along a roadway, § 8-2-7-7; and disorderly conduct, N.M. STAT. ANN. § 30-20-1(a); § 12-2-5(D) ROA.

"Central to this analysis is determining which crime, or crimes, [the] defendant[] could objectively and reasonably have believed that [the Arrested Plaintiffs] committed." *Fogarty*, 523 F.3d at 1156. We disregard evidence of an officer's subjective belief in this inquiry. *See id.* "Instead, we concern ourselves only with whether [the Arrested Plaintiffs'] conduct, as viewed objectively and in the light most favorable to [them], could establish probable cause to believe that [they] had [committed these crimes]." *Id.*

"It is well-established that the police may pool their information to establish probable cause," *United States v. Corral*, 970 F.2d 719, 725 n.4 (10th Cir. 1992) (internal quotation marks omitted). However, Capt. Gonzales must point to an officer who has "relay[ed] information to, or receiv[ed] information from, fellow officers based on personal observation of [the Arrested Plaintffs' behavior]" before we may apply this rule. *Fogarty*, 523 F.3d at 1158 n.10.

We consider whether probable cause existed with respect to each Arrested Plaintiff.

(i) Ms. Silva-Banuelos

Ms. Silva-Banuelos was arrested for resisting, evading, or obstructing an officer and for public nuisance. *See* N.M. STAT. ANN. § 30-22-1. The prosecutor later reduced this charge to a violation of ROA 1994 § 12-2-19 of the Albuquerque City Code, which provides language nearly identical to the state statute.[2]

Under New Mexico law, resisting, evading, or obstructing an officer consists of:

> A. knowingly obstructing, resisting or opposing any officer of this state or any other duly authorized person serving or attempting to serve or execute any process or any rule or order of any of the courts of this state or any other judicial writ or process;
>
> B. intentionally fleeing, attempting to evade or evading an officer of this state when the person committing the act of

---

[2] The ordinance provides:

Resisting, obstructing or refusing to obey an officer consists of either:

> (A) Knowingly obstructing, resisting or opposing any officer of this state or any other duly authorized person serving or attempting to serve or execute any process or any rule or order of any of the courts of this state or any other judicial writ or process; or
>
> (B) Resisting or abusing any judge, magistrate or peace officer in the lawful discharge of his duties; or
>
> (C) Refusing to obey or comply with any lawful process or order given by any police officer acting in the lawful discharge of his duties; or
>
> (D) Interfering with, obstructing or opposing any officer in the lawful discharge of his regular and affixed duties.

ROA § 12-2-9.

-21-

fleeing, attempting to evade or evasion has knowledge that the officer is attempting to apprehend or arrest him;

C. willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed officer in an appropriately marked police vehicle; or

D. resisting or abusing any judge, magistrate or peace officer in the lawful discharge of his duties.

N.M. STAT. ANN. § 30-22-1.

Under New Mexico law, public nuisance consists of:

knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either:
A. injurious to public health, safety, morals or welfare; or
B. interferes with the exercise and enjoyment of public rights, including the right to use public property.
Whoever commits a public nuisance for which the act or penalty is not otherwise prescribed by law is guilty of a petty misdemeanor.

N.M. STAT. ANN. § 30-8-1.

Ms. Silva-Banuelos stood in the sidewalk chanting "police strike" before her arrest. Aplts' App. vol. VIII, at 1993. As horse-mounted officers approached, she moved to the sidewalk, and raised her hands making peace signs. She was arrested by an officer who was on foot. Taking the facts in the light most favorable to Ms. Silva-Banuelos, we agree that Capt. Gonzales brings no argument before this court that such actions constituted either resisting or abusing an officer in the course of his duties. Nor does he offer an argument that her actions could amount to a public nuisance before us on appeal.

Capt. Gonzales focuses his arguments on appeal on those violations for which Ms. Silva-Banuelos was not charged. He contends that there is more than probable cause establishing she violated the City's parade ordinance, as there is no dispute that the demonstrators did not obtain a parade permit, and that they marched on the public streets. *See* ROA 1994 § 7-3-5. Similarly, there is no dispute that state and city law requires persons to walk on the sidewalk if one is available. *See* N.M. STAT. ANN. § 66-7-339, and ROA 1994 8-2-7-7. Finally, Capt. Gonzales maintains that there was probable cause for an officer to believe Ms. Silva-Banuelos was engaging in disorderly conduct.

As to the parade permit ordinance, because Ms. Silva-Banuelos was marching in a procession without a permit, Capt. Gonzales argues that any APD officer could easily have concluded that she was in violation of the ordinance. Similarly, he argues that one video clearly depicts Ms. Silva-Banuelos chanting in the street, in violation of the regulations regarding walking in the street.

However, the Arrested Plaintiffs maintain that several streets were closed before the demonstrators moved to the streets. The protestors assumed that police, by directing the procession, were actually permitting, if not sanctioning, the march and its flow into the streets. Capt. Gonzales argues that "[b]ecause the protestors refused to clear the streets, [he] ultimately ordered the closure of part of Central Avenue to traffic." Aplt's Br. at 27. However, as the district court noted, the historical facts seen in the light most favorable to the plaintiffs would not amount to probable cause because the officers'

conduct essentially amounted to the grant of a *de facto* parade permit, as the officers

would have been aware:

> Seen in the light most favorable to Plaintiffs, the evidence suggests that Defendants may have implicitly sanctioned the march not only by closing off streets to traffic, but also by directing the progress and direction of the precession. In addition, because the authority to grant parade permit applications lay with the APD Chief of Police (Chief Gilbert Gallegos was present at the demonstration), any action by APD officers acquiescing to an unplanned march could reasonably have been interpreted as a waiver of the parade permit requirement. Under the circumstances viewed in a light most favorable to Plaintiff Silva-Banuelos, none of the APD officers could have had probable cause to arrest [her] for violating the Parade Ordinance.

Aplts' App. vol. VIII, at 1996.[3] We agree with the district court's conclusion that, taking

the facts in the light most favorable to Ms. Silva-Banuelos, the APD's street closures and

direction of the procession sanctioned the protestors walking along the road and waived

the permit requirement.

Finally, we turn to Capt. Gonzales's argument that a reasonable officer might have

objectively believed Ms. Silva-Banuelos was engaged in disorderly conduct. *See* N.M.

---

[3]     We also note that the current City ordinance anticipates a similar happenstance:
> If a demonstration begins on the sidewalk but attracts an unexpected number of participants such that the demonstration begins to occupy a portion of the street, the Albuquerque Police Department shall accommodate the protest by closing a segment, lane or portion of the street where so doing will not jeopardize the demonstrators or unreasonably inhibit the flow of traffic on a major traffic route; however, the Albuquerque Police Department is authorized to limit the available portion of the street, where a segment, lane or portion of the street is capable of accommodating the demonstration.

ROA 2005 § 7-3-5(E).

STAT. ANN. § 30-20-1(A) (defining disorderly conduct as "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace"). We have explained:

> Under New Mexico law, disorderly conduct must meet two requirements. The first requirement is that the conduct itself fall into one of the categories enumerated in the statute by being violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly. *Id.* The second prong measures the potential effect of the conduct on others, requiring that it "tend to disturb the peace." *State v. Oden*, 82 N.M. 563, 484 P.2d 1273, 1274 (Ct. App.1971) (holding that "tend to disturb the peace" is an independent element of disorderly conduct). Disturbing the peace requires "an act of violence, or . . . an act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community." *State v. Florstedt*, 77 N.M. 47, 419 P.2d 248, 249 (1966) (quotation omitted).

*Fogarty*, 523 F.3d at 1156-57.

Capt. Gonzales contends there was an "ample basis" for probable cause to believe Ms. Silva-Banuelos engaged in disorderly conduct, as she was "marching through the streets during rush hour traffic and refusing to obey the officers' lawful commands to clear the streets." Aplt's Br. at 28. But, as the district court noted, one video depicts her chanting for about a minute, followed by her standing quietly in the street. There is testimony that one officer identified Ms. Silva-Banuelos as the "long-haired girl" and observed some of her actions. We agree with the district court that one minute of chanting a non-abusive, non-profane slogan ("police strike") does not amount to disturbing the peace or inciting an act of violence. *See, e.g.*, *Hess v. Indiana,* 414 U.S. 105, 108-09 (1973) (overturning disorderly conduct conviction of antiwar protestor who

-25-

yelled "We'll take the f---ing street later (or again)"). We thus reject Capt. Gonzales's suggestion that there was probable cause for her arrest.

(ii) Mr. Doyon

Mr. Doyon was also charged with resisting, evading, or obstructing an officer and public nuisance. *See* N.M. STAT. ANN. §§ 30-22-1(D); 30-8-1. Capt. Gonzales maintains that the cowbell and other percussion instruments were interfering with his officers' ability to communicate with the protestors. Mr. Doyon claimed that the music actually assuaged tension in the crowd. He further stated he did not hear any orders to move from the intersection, nor did anyone tell him to cease playing music.

As above with respect to Ms. Silva-Banuelos, Capt. Gonzales provides no substantive argument before this court in support of the elements of the charged offenses. Mr. Doyon did not resist arrest, nor did he engage in conduct directed at the officers, and Capt. Gonzales does not argue that Mr. Doyon interfered with public property.

With regard to the uncharged offenses, we apply the same reasoning as above regarding the Parade Ordinance and the ordinance and statute regarding walking in the street, in that the officers' closure of the street may have been interpreted as a sanctioning of the demonstration.

Finally, we turn to Capt. Gonzales's argument that there was probable cause supporting Mr. Doyon's arrest for the uncharged offenses of disorderly conduct, N.M. STAT. ANN. § 30-20-1(A) (defining disorderly conduct as "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which

-26-

tends to disturb the peace"), and ROA 1994 § 12-2-5(D) (defining disorderly conduct as "engaging in any public place in violent, abusive or indecent conduct" and "[i]nciting, causing, aiding, abetting or assisting in creating any riot, affray, or disturbance at . . . any . . . public place in the city"). In New Mexico, disorderly conduct is conduct with the "tendency [ ] to disturb the peace." *State v. Salas*, 986 P.2d 482, 486 (N.M. Ct. App.1999). A breach of the peace is an act likely to cause violence or which disturbs the peace and quiet of the community by causing "consternation and alarm." *State v. Doe*, 583 P.2d 464, 466 (N.M. 1978). As noted above, "[u]nder New Mexico law, disorderly conduct must [be] . . . violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly," and it must "tend to disturb the peace." *Fogarty*, 523 F.3d at 1156-57 (internal quotation marks omitted).

As to unreasonably loud and disorderly behavior, Capt. Gonzales argues that the crowd was "loud and unruly," and the percussion playing was "riling up the members of the protest and otherwise tending to disturb the peace." Aplt's Br. at 29, 30. Mr. Doyon responds that he was surrounded by protestors who were chanting, speaking into megaphones, and playing percussion instruments." Aples' Br. at 45 (quoting Aplts' App. vol. VIII, at 2000). He stated that his bell-ringing "actually helped to de-escalate the rising tension in the crowd." *Id.* at 46. As was the case with a fellow percussion player, the district court found sufficient support in the record that Mr. Doyon was playing at a reasonable volume. *See Fogarty*, 523 F.3d at 1158.

-27-

Capt. Gonzales argues that he ordered Mr. Doyon's arrest because the percussion instruments "interfered with his efforts to communicate with the crowd, as well as incited hostility towards the police." Reply Br. at 12. He concedes, however, that there is conflicting testimony on this point, and we agree that "crediting the facts found by the district court and those that it likely assumed, we are precluded from holding that [Mr. Doyon's] conduct threatened to incite violence or create 'consternation and alarm' as required by New Mexico law." *Fogarty*, 523 F.3d at 1158.

(iii) Mr. Kisner

Mr. Kisner faced the same charges as Mr. Doyon: resisting, evading, or obstructing an officer and public nuisance. *See* N.M. STAT. ANN. §§ 30-22-1(D); 30-8-1. Mr. Kisner, like Mr. Doyon, engaged in behavior that did not provide probable cause to arrest for either resisting or obstructing an officer or public nuisance. His interaction with the police was limited to chanting "shame" toward a number of officers and asking an officer why he could not remain on the sidewalk. There is no indication that his conduct approached abuse of an officer in the course of his duties. And, as the district court noted, Mr. Kisner's posing questions to an officer did not constitute resisting an officer. Aplts' App. vol. VIII, at 2002 (citing *Cortez*, 478 F.3d at 1128 ("Although plaintiff briefly asked Defendants what was going on before complying with their commands to exit the residence, this does not amount to resistance.")). And, similar to Ms. Silva-Banuelos's, Mr. Kisner's activities did not interfere with the right to use public property

-28-

in a manner sufficient to support an arrest for public nuisance. We thus consider whether there was probable cause to arrest for the uncharged misdemeanors.

The demonstrators may have reasonably viewed the officers' involvement in closing the streets and directing the protest to be a sanctioning of the demonstration. Capt. Gonzales offers little support for Mr. Kisner's uncharged disorderly conduct misdemeanor, N.M. STAT. ANN. § 30-20-1(A). Probable cause existed to arrest each of the Arrested Plaintiffs for violation of this statute, he argues, because the protestors were marching through the streets during rush hour traffic and refusing to obey officers' lawful commands to clear the streets. However, under our standard of review, we agree with the district court that non-abusive chanting as part of a large-scale demonstration "could hardly qualify as disturbing the peace." Aplts' App. vol. VIII, at 2004. Further, we agree that a "reasonable officer would not have believed, based on the facts most favorable to Michael Kisner, that probable cause existed to arrest him for the crimes with which he was not charged." *Id.*

### ii. Clearly established right

Having concluded the district court correctly determined that the facts alleged demonstrate that Capt. Gonzales's conduct violated a constitutional right, *see Saucier*, 533 U.S. at 201, we next consider his third argument as to "whether the right was clearly established." *Id.* This question "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotation marks omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is

-29-

whether it would be clear to a reasonable officer that his conduct was unlawful" under the circumstances presented. *Fogarty*, 523 F.3d at 1155 (quoting *Saucier*, 533 U.S. at 202). Capt. Gonzales argues that the Arrested Plaintiffs' arrests were objectively reasonable because there is no evidence that he violated a clearly established constitutional right. We disagree.

"In the context of an unlawful arrest our analysis is simple, for the law was and is unambiguous: a government official must have probable cause to arrest an individual." *Fogarty*, 523 F.3d at 1158-59 (internal quotation marks omitted). As the above analysis demonstrates, the record does not suggest behavior that allowed Capt. Gonzales "to infer that probable cause existed to arrest the [Arrested Plaintiffs]." Aplts' App. vol. VIII, at 2010. Viewing the facts most favorably to the Arrested Plaintiffs, Capt. Gonzales's issuance of arrest orders, when on notice that probable cause was lacking, was a violation of a clearly established right.

### iii. Supervisory liability for arrests

We turn to Capt. Gonzales's final argument related to the arrests and seizures, which challenges the district court's conclusions regarding supervisory liability. As noted above, we cannot review the district court's sufficiency of the evidence determinations. *Fogarty*, 523 F.3d at 1154. The district court made the following findings:

> It is undisputed that Defendant Gonzales acted as the incident commander in charge of the police response to the March 20, 2003 demonstration. It has also already been established that Defendant Gonzales did not expect his officers to take independent action unless they received specific directives, and this was particularly true concerning the use of force. As the incident commander, Defendant Gonzales *directly supervised his officers' conduct and issued*

-30-

*directives as he followed the progress of the protest*.  In addition, Defendant
Gonzales authorized the use of chemical munitions and pepper ball rounds,
and personally deployed a tear gas canister.  Also as discussed above,
Defendant Gonzales directed his officers to arrest certain protestors who were
playing percussion instruments, including Plaintiff Doyon, and ordered the use
of force to sweep people from the sidewalk in front of the Frontier restaurant,
where Plaintiff Michael Kisner was standing.

Aplts' App. vol. VIII, at 2035 (citations omitted) (emphasis added).

Accepting the district court's factual determinations, we agree that Capt.

Gonzales's personal participation and exercise of control or direction made him the

apparent commander in charge at the scene.  We further agree that these determinations

support the conclusion that Capt. Gonzales is liable as a supervisor for the

unconstitutional arrests of the Arrested Plaintiffs.  Thus, Capt. Gonzales may be

personally liable for the seizures of the Arrested Plaintiffs under a supervisory liability

theory.  *See Rizzo v. Goode*, 423 U.S. 362, 371 (1976) (finding that supervisory personnel

could be held liable where the plaintiff demonstrates an "affirmative link" between the

constitutional violation and the defendant's actions, typically through "the adoption of

any plan or policy . . . showing authorization or approval"); *Fogarty*, 523 F.3d at 1162

("[I]n situations where an affirmative link exists between the constitutional deprivation

and either the supervisor's personal participation, his exercise of control or direction, or

his failure to supervise, the supervisor may be personally liable." (internal quotation

marks omitted)).

2. Excessive force

Having held that Capt. Gonzales was not entitled to qualified immunity at this juncture with respect to the Arrested Plaintiffs' wrongful arrest claims, we move to the second claim in this appeal: that qualified immunity shields Capt. Gonzales from the excessive force claims.

When we examine claims of excessive force, "[w]e analyze whether the force used to effectuate an arrest violates an individual's Fourth Amendment rights under the 'objective reasonableness' standard of the Fourth Amendment." *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). "A court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." *Id.* (internal quotation marks omitted). When measuring the reasonableness of the force used, we must consider, among other things, "the alleged crime's severity, the degree of potential threat that the suspect poses to an officer's safety and to others' safety, and the suspect's efforts to resist or evade arrest." *Id.* We also note that unreasonable force claims are generally fact questions for the jury. *See Quezada v. County of Benalillo*, 944 F.2d 710, 715 (10th Cir. 1991) ("[W]hether the police used excessive force in a § 1983 case has always been seen as a factual inquiry best answered by the fact finder.") (collecting cases), *overruled on other grounds by Saucier v. Katz*, 532 U.S. 194 (2001).

Capt. Gonzales argues that his lack of physical contact with any of the Excessive Force Plaintiffs negates any "personal involvement in the alleged constitutional

violation." *Foote v. Speigel*, 118 F.2d 1416, 1423 (10th Cir. 1997).  He next argues that those actions he did authorize (*i.e.*, limited deployment of tear gas and use of pepper spray, limited use of non-lethal projectiles) were objectively reasonable and not excessive, for he never would have authorized excessive force.  He also suggests that any constitutional violation was not clearly established.  Finally, he argues that the district court erred when it concluded there was an "affirmative link" between his actions and those independent actions of the officers.

First, with respect to personal participation, we have established above that Capt. Gonzales may be held individually liable for his actions as the on-the-scene supervisor at the demonstration and his personal involvement in the arrests of the Arrested Plaintiffs.  Similarly, we hold that, viewing the facts favorably toward the plaintiffs, Capt. Gonzales's actions as on the scene commander-in-chief extend to his personal involvement with regard to his officers' alleged use of force against the Excessive Force Plaintiffs.  Second, as to whether or not the officers' force was excessive, under the Plaintiffs' view of the facts, we answer in the affirmative.  Capt. Gonzales argues that the use of tear gas and pepper ball rounds, the only measures he allowed, were reasonable.  He does not address the claims regarding pushing, dragging, and shoving, stating "there is no evidence that he undertook such actions or otherwise directed, participated or acquiesced in such actions by his subordinate officers."  Aplt's Br. at 41, n.6.  We have rejected this claim above, as he was the commanding officer and held a tight rein on his officers' actions.  Viewing the facts in the light most favorable to the Excessive Force

Plaintiffs, we hold that Capt. Gonzales is not entitled to qualified immunity at this stage of the litigation. Finally, to the extent Capt. Gonzales challenges the sufficiency of the evidence supporting the allegations of excessive force, we do not have jurisdiction to review this claim. *Lowery v. County of Riley*, 522 F.3d 1086, 1091 (10th Cir. 2008) ("We do not have jurisdiction to resolve disputed issues of fact and have therefore observed that a defendant may not appeal the sufficiency – as opposed to the legal significance – of the plaintiff's evidence.").

a. Constitutional Violation

We will next consider whether, assuming his or her allegations to be true, each Excessive Force Plaintiff has established that Capt. Gonzales violated his or her constitutional rights. In evaluating each claim, we will consider Capt. Gonzales's challenges regarding the reasonableness of the force used against each Excessive Force Plaintiff.

i. Ms. Chavez

As described by the district court, Aplts' App. vol. VIII, at 1968-69, while standing near Central Avenue and Harvard Drive, Ms. Chavez saw an officer shoot a non-lethal round at the protestor next to her, causing the protestor to scream and fall down. She sat down in the street on Central Avenue near Cornell Drive as a sign of protest. She witnessed officers taking away other protestors in the crowd.

While seated in the street and not posing any threat, Ms. Chavez was subjected to tear gas and then shot repeatedly with pepper ball rounds. She saw officers deploy tear

gas canisters into the crowd. She also witnessed the police shoot a second volley of tear gas canisters into the area in front of the UNM Bookstore, which is where the officers had been directing protestors to go. Ms. Chavez felt that she could not move. The gas burned her eyes and she started choking. Because she was focused on regaining control of her breathing, Ms. Chavez does not recall feeling the impact of the pepper ball rounds on her body, nor did the projectiles leave any welts, marks, or bruises. She did, however, know that guns were pointed in her direction.

Ms. Chavez was aware of the possibility that she might be arrested for sitting in the street, but she did not expect to be subjected to tear gas or shot. Even after lying down to show that she was not a threat, she was repeatedly shot with pepper ball rounds. Other protestors eventually attempted to escort her to safety, but as they were doing so, an officer shoved Ms. Chavez from behind with his baton, knocking her down onto Central Avenue. She lay there, unable to stand, trying to breathe, coughing, her eyes burning. Once she could stand, other protestors helped her onto the sidewalk in front of the Frontier restaurant. Ms. Chavez leaned against a light pole, trying to recover, when more police officers, yelling, screaming, and pushing with their batons, forced her back onto Central Avenue. She did not know what they wanted her to do, so she cried out to them to tell her where to go. They yelled back that she was to go across the street, and she complied.

The district court determined that the repeated shooting of pepper ball rounds at Ms. Chavez, who was lying in the street, was an unreasonable use of force. Aplts' App.

vol. VIII, at 2027 (citing *Holland* ex rel *Overdorff v. Harrington*, 268 F.3d 1179, 1193 (10th Cir. 2001) ("Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person . . . ."). Pepper balls are "rifle-fired projectiles that break into pieces upon impact and release oleoresin capsicum powder (commonly known as mace), thereby causing both pain at the point of impact and irritation of the targeted individual's eyes and breathing passages." *Fogarty*, 523 F.3d at 1152 n.4. Here, the severity of Ms. Chavez's purported infractions and the degree of potential threat that she posed to an officer's and to others' safety appeared to be nil – she was lying on the ground. She also did not resist or evade arrest. "*Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Casey*, 509 F.3d at 1285. To the extent Capt. Gonzales argues that, even viewing the facts favorably to Ms. Chavez, the force could not be viewed as unreasonable, we disagree. To the extent Capt. Gonzales challenges the district court's factual findings, we reiterate that we are without jurisdiction to review the sufficiency of evidence as to whether a jury might conclude that the officers' use of force was excessive.

ii. Mr. Doyon

Our analysis as to Mr. Doyon is similar: faced with possible misdemeanor charges, he did not attempt to flee, or pose a threat to any officer or individual. The officers grabbed him, dragged him, and pushed him face down on the pavement. One

officer kneed him in the back and pinned him to the ground. An officer pushed him face forward onto the roof of a police car, and he was exposed to tear gas while handcuffed in the car. To the extent Capt. Gonzales challenges the district court's application of the law, we hold that, viewing the facts most favorably to Mr. Doyon, that a jury might conclude that the officer's force was constitutionally unreasonable. *Casey*, 509 F.3d at 1285. Again, we are without jurisdiction to review the sufficiency of evidence as to whether a jury might conclude that the officer's use of force was excessive.

### iii. Mr. Kisner

Mr. Kisner did not resist arrest, attempt to flee, or pose a risk to an officer or anyone else. "A horse-mounted officer used his horse to repeatedly hit [him] in the face, about the head, and in his chest." Aplts' App. vol. VIII, at 2028. Another officer sprayed Mr. Kisner with pepper spray. When trying to retreat, horse-mounted officers pinned him between two horses, "kicked him in the back, shook him violently . . . by his shoulder strap of his backpack, and impelled him forward by releasing the strap." *Id.* The officers again approached him, and pulled him by the straps of his backpack, between the two horses, and pulled him up on his toes. Viewing the factors favorably toward Mr. Kisner, we again agree with the district court's conclusion that a jury could consider the alleged constitutional deprivation to be unreasonable. And again, to the extent Capt. Gonzales challenges the sufficiency of the evidence determinations, we are without jurisdiction to review this claim.

### b. Clearly established law

Having determined that the Excessive Force Plaintiffs have sufficiently alleged a constitutional violation, we now turn to the second prong of the qualified immunity analysis, asking whether existing case law gave the defendants fair warning that their conduct violated the plaintiff's constitutional rights. *See Novitsky v. City of Aurora*, 491 F.3d 1244, 1255-56 (10th Cir. 2007). The law is clearly established either if courts have previously ruled that materially similar conduct was unconstitutional, or if "a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct" at issue. *United States v. Lanier*, 520 U.S. 259, 271 (1997).

Here, Capt. Gonzales cabins his argument to the authorization of "the limited deployment of tear gas, pepper spray and non-lethal projectiles," Aplt's Br. at 41, urging that clearly established law did not prohibit these actions in this particular situation. He contends that the district court did not define the right allegedly violated with the appropriate level of specificity. *Id.* ("[N]either the Arrested Plaintiffs nor the district court cited to any controlling precedent that bears a 'substantial correspondence' to Capt. Gonzales's conduct." (quoting *Hannula v. City of Lakewood*, 907 F.2d 129, 131 (10th Cir. 1990)).

We briefly turn to whether the specific facts the Excessive Force Plaintiffs presented demonstrate that Capt. Gonzales's conduct violated *Graham*'s well-established parameters. We must disagree with Capt. Gonzales's characterization regarding specificity of the right alleged. With regard to Ms. Chavez, she posed no threat and did not attempt to flee. With regard to Mr. Doyon and Mr. Kisner, not one of the suspected

crimes charged or uncharged was severe, neither posed a threat to the safety of an officer or others, and neither attempted to flee or evade arrest. We have stated that *Graham* undoubtedly speaks to this right: "an officer's violation of the *Graham* reasonableness test is a violation of clearly established law if there are 'no substantial grounds for a reasonable officer to conclude that there was legitimate justification' for acting as she did." *Casey*, 509 F.3d at 1286 (quoting *Holland*, 268 F.3d at 1197). As in *Casey,* "each factor in *Graham* counseled against the use of a large amount of force" against each of the Excessive Force Plaintiffs. *See Graham*, 490 U.S. at 396. Thus, we have little difficulty in holding that the law was clearly established at the time of the alleged infraction. *See Fogarty*, 523 F.3d at 1162 ("Considering that under [the plaintiff's] version of events each of the *Graham* factors lines up in his favor, this case is not so close that our precedents would fail to portend the constitutional unreasonableness of defendants' alleged actions.").

### c. Supervisory liability for excessive force

As to Capt. Gonzales's suggestion that the extent to which he can be held liable as a supervisor is limited, because there is no "affirmative link" between his actions and those of his officers, we must disagree. Viewing the facts in favor of plaintiffs, we agree with the district court's conclusion that:

> there is an *affirmative link between Defendant Gonzales and the use of excessive force against Plaintiffs Chavez, Doyon, and Michael Kisner sufficient to overcome a motion for summary judgment.* Seen in the light most favorable to these three Plaintiffs, the evidence suggests that Defendant Gonzales set in motion a series of events that *he knew or reasonably should have known* would cause his officers to violate Plaintiffs Chavez, Doyon, and

-39-

Michael Kisner's constitutional rights when he authorized the use of pepper ball rounds, ordered Plaintiff Doyon's arrest, and ordered his officers to sweep people from the front of the Frontier  restaurant.

Aplts' App. vol. VIII, at 2035 (citations omitted) (emphasis added).

Unlike *Holland*, upon which Capt. Gonzales relies, here, Capt. Gonzales allowed and encouraged the use of force against compliant demonstrators.  In *Holland*, the decision to deploy a SWAT team to execute misdemeanor warrants was determined not to establish an affirmative link to the alleged excessive force.  *Holland*, 268 F.3d at 1191.  There, "plaintiffs did not show that [defendants] decided to use the SWAT team knowing that the SWAT team would use excessive force, intending to cause harm to any person, or that they instructed the SWAT team to use excessive force while conducting the . . . raid."  *Id.*  Here, Capt. Gonzales did not want his officers to act independently.  He contacted his officers through radio, hand signal, and direct verbal command.  He deployed chemical munitions, and also ordered the deployment of tear gas, pepper ball rounds, and bean bag projectiles.  He directed the arrest of several protestors and encouraged the arrests of others.  We agree that he authorized his officers to use force against protestors, and, viewing the facts in the light most favorable to the Excessive Force Plaintiffs, we agree with the district court that Capt. Gonzales could be held liable under § 1983 as a supervisor.  To the extent Capt. Gonzales challenges the district courts factual findings as to the sufficiency of evidence, we do not have jurisdiction to assess such claims.  *See Walker v. City of Orem*, 451 F.3d 1139, 1154 (10th Cir. 2006) ("A defendant may not immediately appeal a district court's order denying qualified immunity . . .  merely to

-40-

dispute the district court's conclusions that plaintiff's claims are supported by sufficient evidence in the record or that disputed issues of material fact exist which preclude summary judgment.").

3. First Amendment Retaliation Claim

Capt. Gonzales next challenges the district court's determination that he violated plaintiffs' First Amendment rights to freedom of expression and assembly, when he authorized the use of force to break up the protest. First, he contends there is no clearly established First Amendment right at issue, and second, he argues that the district court erred in finding that there was sufficient evidence that he intended to interfere with plaintiffs' First Amendment rights.

Our analysis is brief. To start, "[i]t has long been clearly established that the First Amendment bars retaliation for protected speech and association." *Mimics*, 394 F.3d at 848 (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998)); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968) (concluding that public school employee could not be terminated because of exercise of employee's First Amendment rights).

We examine First Amendment retaliation claims under *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000). Our *Worrell* inquiry revolves around the evidence supporting (1) that plaintiffs were engaged in constitutionally protected activity; (2) whether defendants caused the plaintiffs to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) whether defendants' actions were motivated by plaintiffs' protected activity. *Id.* at 1212.

-41-

Capt. Gonzales challenges the district court's conclusion that a material issue of fact existed as to whether law enforcement sought to "end the protest, rather than just to clear the protestors from the streets." Aplt's Br. at 49 (quoting Aplts' App. vol. VIII, at 2038). We are without appellate jurisdiction over an interlocutory appeal when the appellant contests, as Capt. Gonzales does here, the district court's determination that a dispute of material fact remains. *Walker*, 451 F.3d at 1154 (10th Cir. 2006).

4. Remaining claims

Capt. Gonzales's remaining claims (challenging the denial of summary judgment on retaliatory prosecution under § 1983, malicious prosecution under § 1983, and the state tort claim of malicious abuse of process) revolve around sufficiency of the evidence as to Capt. Gonzales's motivation and whether he was propelled by malice.[4] As

---

[4] *See Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007) ("To establish a § 1983 retaliation claim against non-immune officials, [plaintiff] must plead and prove (1) that she was engaged in a constitutionally protected activity; (2) that a defendant's action caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that a defendant's action was substantially motivated as a response to her exercise of her First Amendment speech rights." (citing *Worrell*, 219 F.3d at 1112)); *Novitsky*, 491 F.3d 1244, 1258 (10th Cir. 2007) (the elements of malicious prosecution are (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages); *DeVaney v. Thriftway Mktg. Corp.* 953 P.2d 277, 283 (1997) (under New Mexico law, the elements of malicious abuse of process are: (1) the initiation of judicial proceedings against the plaintiff by defendant; (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages).

explained above as to Capt. Gonzales's motivation with respect to the First Amendment retaliation claim, we are without jurisdiction to review these claims, because a material issue of fact exists. *Id.* As to the state law tort, we may reach Capt. Gonzales's state law arguments only by exercising pendent appellate jurisdiction. *Fogarty*, 523 F.3d at 1154.

We briefly consider the state law tort. Under New Mexico law, the tort of malicious abuse of process requires "(1) the initiation of judicial proceedings against the plaintiff by the defendant; (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages." *Durham v. Guest*, 171 P.3d 756, 766 (N.M. Ct. App. 2007). The district court found sufficient evidence to satisfy the first three elements of the tort, and found that Capt. Gonzales did not challenge the fourth element.

"It is appropriate to exercise pendent appellate jurisdiction only where resolution of the appealable issue necessarily resolves the nonappealable issue, or where review of the nonappealable issue is necessary to ensure meaningful review of the appealable one." *Berrey v. Asarco, Inc.*, 439 F.3d 636, 647 (10th Cir. 2006). Thus, if Capt. Gonzales had argued and could demonstrate that the state-law claim is "inextricably intertwined with the district court's qualified immunity determinations," or consideration of this claim is "necessary to ensure meaningful review" of the qualified immunity rulings, we might exercise pendent appellate jurisdiction. *Fogarty*, 523 F.3d at 1155. Capt. Gonzales makes no such argument, and, if he did, noting our disposition of the federal claims, it is

likely we would similarly rule here.  Thus for these reasons, we conclude that "[i]t would

be inappropriate to reach these fact-intensive state-law claims in this appeal."  *Id.*

## III. CONCLUSION

Accordingly, we affirm the district court's denial of summary judgment and denial

of qualified immunity as to (1) the unlawful seizure and arrest claims, (2) Capt.

Gonzales's personal involvement in and the clearly established nature of the excessive

force claims, and (3) the clearly established nature of Plaintiffs' First Amendment

retaliation claims.  We dismiss the remainder of the appeal of the § 1983 claims for lack

of jurisdiction, and we decline to exercise pendent jurisdiction over the state tort claim.